# United States Court of Appeals for the Federal Circuit

2009-1375

AD HOC SHRIMP TRADE ACTION COMMITTEE,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

THAI I-MEI FROZEN FOODS CO., LTD.,

Defendant.

Nathaniel M. Rickard, Picard, Kentz & Rowe LLP, of Washington, DC, argued for plaintiff-appellant. Of counsel were Andrew W. Kentz and Kevin O'Connor.

Stephen C. Tosini, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.

Appealed from: United States Court of International Trade

Judge Evan J. Wallach

# United States Court of Appeals for the Federal Circuit

2009-1375

AD HOC SHRIMP TRADE ACTION COMMITTEE,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

THAI I-MEI FROZEN FOODS CO., LTD.,

Defendant.

Appeal from the United States Court of International Trade in case no. 07-00378, Judge Evan J. Wallach.

_____

DECIDED: March 2, 2010

_____

Before RADER, ARCHER, and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge ARCHER. Dissenting opinion filed by Circuit Judge PROST.

ARCHER, Circuit Judge.

Ad Hoc Shrimp Trade Action Committee ("AHSTAC") appeals the United States Court of International Trade's affirmance of the Department of Commerce's ("Commerce") determination in Certain Frozen Warmwater Shrimp from Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 72 Fed. Reg. 52,065 (Sept. 12, 2007) ("Final Results"). Ad Hoc Shrimp Trade Action

Committee v. United States, 616 F. Supp. 2d 1354 (Ct. Int'l Trade 2009).  Specifically, AHSTAC challenges the court's approval of Commerce's determination that the multinational corporation provision, 19 U.S.C. § 1677b(d) ("MNC Provision"), does not apply in the situation when the non-exporting country is a nonmarket economy[1] and normal value is based on a factors-of-production methodology under 19 U.S.C. § 1677b(c).  Because Commerce's interpretation of the MNC Provision was reasonable, we affirm.

I

A

After completing the first administrative review of an antidumping order covering certain warmwater shrimp from Thailand, Commerce published its final results.  See Final Results.  AHSTAC filed an action with the Court of International Trade challenging, among other things, Commerce's determination that the MNC Provision did not apply to Thai I-Mei Foods Co., Ltd. ("Thai I-Mei"), a company with affiliates in the People's Republic of China ("PRC") and Vietnam, both nonmarket economies. The court determined that Commerce had correctly declined to apply the MNC Provision, because AHSTAC failed to show that element two of the MNC Provision applied to Thai I-Mei. Ad Hoc Shrimp Trade Action Committee, 616 F. Supp. 2d at 1364.  The court further determined that Commerce's interpretation of the MNC Provision was reasonable.  Id. at 1365.

---

[1]     A nonmarket economy country is one that Commerce "determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

AHSTAC appeals the Court of International Trade's affirmance of Commerce's determination that "Congress did not intend [the MNC Provision to apply] when the non-exporting country is [a nonmarket economy] and [normal value] is based on a factors-of-production methodology."  "Issues and Decision Memorandum" accompanying Final Results at 37.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

B

The MNC Provision is a special rule for calculating the normal value (home market price) of goods for multinational corporations.  It generally provides that if a respondent is affiliated with a company in another country and if that respondent has no viable home market for purposes of calculating normal value, then Commerce uses the affiliate's normal value as the normal value for the respondent if the affiliate's normal value is higher than the respondent's normal value.

The MNC Provision itself states:

(d) Special rule for certain multinational corporations

Whenever, in the course of an investigation under this subtitle, the administering authority determines that--

(1) subject merchandise exported to the United States is being produced in facilities which are owned or controlled, directly or indirectly, by a person, firm, or corporation which also owns or controls, directly or indirectly, other facilities for the production of the foreign like product which are located in another country or countries,

(2) subsection (a)(1)(C) of this section applies, and

(3) the normal value of the foreign like product produced in one or more of the facilities outside the exporting country is higher than the normal value of the foreign like product produced in the facilities located in the exporting country,

it shall determine the normal value of the subject merchandise by reference to the normal value at which the foreign like product is sold in substantial quantities from one or more facilities outside the exporting

country. The administering authority, in making any determination under this paragraph, shall make adjustments for the difference between the cost of production (including taxes, labor, materials, and overhead) of the foreign like product produced in facilities outside the exporting country and costs of production of the foreign like product produced in facilities in the exporting country, if such differences are demonstrated to its satisfaction. For purposes of this subsection, in determining the normal value of the foreign like product produced in a country outside of the exporting country, the administering authority shall determine its price at the time of exportation from the exporting country and shall make any adjustments required by subsection (a) of this section for the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States by reference to such costs in the exporting country.

19 U.S.C. § 1677b(d).[2]

The MNC Provision was intended to address the pricing practice of multinational corporations wherein a corporation would offset lower price home market sales with

---

[2] Subsection (2) refers to 19 U.S.C. § 1677b(a)(1)(C). This provision states:

(C) Third country sales

This subparagraph applies when--

(i) the foreign like product is not sold (or offered for sale) for consumption in the exporting country as described in subparagraph (B)(i),

(ii) the administering authority determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States, or

(iii) the particular market situation in the exporting country does not permit a proper comparison with the export price or constructed export price.

For purposes of clause (ii), the aggregate quantity (or value) of the foreign like product sold in the exporting country shall normally be considered to be insufficient if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States.

19 U.S.C. § 1677b(a)(1)(C).

high priced third country sales, thereby masking the dumping of merchandise from the home market that is under investigation:

> The Antidumping Act of 1921, in its present form, cannot be applied to discriminatory pricing by a multinational corporation which sells products made in a plant in one foreign country at low prices to the United States, while the same company or its subsidiary in another foreign country subsidizes those low-priced sales with high-priced sales of the same product to customers in its own market. The factory in the country producing for export (country A) may make insignificant or no sales to its home market. On the other hand, the factories in countries which sell at higher prices (countries B and C) may be primarily engaged in selling to their home market, and the profitability of the overall operation may be largely derived from the home market sales. In such a case, the low-priced export sales are effectively being supported by the higher-priced sales of the affiliated factories in the home market, which is often highly protected from outside competition. This practice is a form of price discrimination which could severely injure domestic producers.

S. Rep. No. 93-1298, at 174 (1974), reprinted in 1974 U.S.C.C.A.N. 7186, 7311.

II

"We review de novo whether Commerce's interpretation of a government statutory provision is in accordance with law, but we do so within the framework established by Chevron." Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1029-30 (Fed. Cir. 2007). The first step of the Chevron analysis is to determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). "Under step two of Chevron, if an agency's statutory interpretation promulgated under the authority delegated it by Congress is 'reasonable' it is 'binding [o]n the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.'"

<u>Wheatland Tube Co. v. United States</u>, 495 F.3d 1355, 1360 (Fed. Cir. 2007) (quoting <u>Chevron</u>, 467 U.S. at 844).

Accordingly, Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." <u>United States v. Eurodif S.A.</u>, 129 S.Ct. 878, 886-87 (2009) (citing <u>United States v. Mead Corp.</u>, 533 U.S. 218, 229-30 (2001)). "'The whole point of <u>Chevron</u> is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" <u>Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.</u>, 545 U.S. 967, 981 (2005) (quoting <u>Smiley v. Citibank (South Dakota), N.A.</u>, 517 U.S. 735, 742 (1996)). Further, we "give Commerce's interpretation of antidumping laws significant deference because of its special expertise in administering antidumping duty law." <u>Wheatland Tube</u>, 495 F.3d at 1360 (Fed. Cir. 2007).

III

A

The first step of <u>Chevron</u> asks the question whether "Congress has directly spoken to the precise question at issue." <u>Chevron</u>, 467 U.S. at 842. "[I]f the statute is silent or ambiguous with respect to the specific issue," the answer is "no," and we proceed to step two of <u>Chevron</u>. <u>Id.</u> at 843; <u>see also</u> <u>SKF USA, Inc. v. United States</u>, 537 F.3d 1373, 1379 (Fed. Cir. 2008) ("[I]f a statute is silent or ambiguous with respect to a specific issue, we 'must defer to an agency's reasonable interpretation of a statute even if [we] might have preferred another.'" (quoting <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565, 1570 (Fed. Cir. 1998))). Thus, we must first determine whether Congress has spoken directly to the issue of whether the MNC Provision is applicable when the

non-exporting country is a nonmarket economy and normal value is based on a factors-of-production methodology.

The MNC Provision is silent regarding nonmarket economies. This would suggest that the answer to the question of <u>Chevron</u> step one is "no." <u>See</u> <u>Wheatland Tube</u>, 495 F.3d at 1360 (concluding that 19 U.S.C. § 1677a(c)(2)(A) was ambiguous based on Congress's silence on the issue of whether § 201 safeguard duties are to be considered "United States import duties" for purposes of determining the export price and calculating dumping margin); <u>see also</u> <u>SNR Roulements v. United States</u>, 402 F.3d 1358, 1361-62 (Fed. Cir. 2005) (reaching step two of <u>Chevron</u> "[b]ecause nothing in the [statutory] language addresses the question of whether Commerce must use an imputed value when calculating total expenses if it has used an imputed value in calculating total United States expenses . . . ").

However, AHSTAC asserts, and the dissent agrees, that the plain language of the statute requires the application of the MNC Provision whenever the conditions set forth are met, essentially rendering Congress's silence insignificant. The dissent notes that "Congress need not explicitly negate all potential exceptions to a given statute in order to ensure that the plain language of the statute is given effect." Dissent at 2. We agree with this statement on its face.[3] However, that situation is not present here.

---

[3]  Indeed, <u>Brockamp v. United States</u>, 519 U.S. 347, 348 (1997), the case cited by the dissent, presents such a situation. At issue there was whether 26 U.S.C. § 6511, the statutory time limitation provision for filing tax refund claims, could be tolled for "nonstatutory equitable reasons." Section 6511 "set forth its limitations in a highly detailed manner" and also set forth explicit exceptions. <u>Id.</u> at 350. The Court observed that "[s]ection § 6511's detail, its technical language, the iteration of the limitations in both procedural and substantive forms, and the explicit listing of exceptions, taken together indicate to us that Congress did not intend courts to read

By no means does the statutory language make it clear that Congress intended the MNC Provision to apply when the non-exporting country is a nonmarket economy and normal value is based on a factors-of-production methodology. The statute instructs Commerce to determine the normal value of the subject merchandise by reference to the "normal value at which the foreign like product is sold in substantial quantities from one or more facilities outside the exporting country." MNC Provision (emphasis added). The statute further states that when Commerce determines the normal value of the foreign like product it "shall determine its price at the time of exportation from the exporting country . . . ." Id. (emphasis added). The terms "sold" and "price" are not used to describe calculating the normal value in a nonmarket economy. In a nonmarket economy, Commerce generally does not determine normal value by reference to the prices at which the product is sold, because of the likely price distortion due to state involvement. Rather, Commerce uses factors of production under 19 U.S.C. § 1677b(c) to determine normal value in a nonmarket economy.[4]

---

other unmentioned, open-ended 'equitable' exceptions into the statute it wrote." Id. at 357.

[4] Subsection (c)(1) states the general provision for determining normal value for nonmarket economy countries:

> (c) Nonmarket economy countries
> (1) In general
> If--
> (A) the subject merchandise is exported from a nonmarket economy country, and
> (B) the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined under subsection (a) of this section,
> the administering authority shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and

Accordingly, if anything, the language of the MNC Provision actually suggests it does not apply when the non-exporting country is a nonmarket economy and normal value is based on a factors-of-production methodology.

Given the MNC Provision's silence as to whether it applies when the non-exporting country is a nonmarket economy and normal value is based on a factors-of-production methodology and the provision's lack of clear language to the contrary, we cannot say that Congress has directly spoken to the issue of the MNC Provision's applicability in the present case. As a result, such a determination falls within the province of the agency, and we reach step two of the Chevron analysis.

B

The question under step two is whether Commerce's interpretation of the MNC Provision is reasonable. Chevron, 467 U.S. 843. Commerce determined that "Congress did not intend for the application of [the MNC Provision] when the non-exporting country is [a nonmarket economy] and [normal value] is based on a factors-of-production methodology." "Issues and Decision Memorandum" accompanying Final Results at 36-37.

In reaching this conclusion, Commerce first observed that the language of the statute itself (as discussed above) supported its interpretation. Commerce explained that in nonmarket economies it does not determine normal value by reference to the prices at which merchandise is sold but rather uses factors of production pursuant to

other expenses. Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1).

19 U.S.C. § 1677b(c). This is because sales of merchandise in nonmarket economies do not reflect the fair value of merchandise. Thus, it is reasonable to conclude that Congress's use of the terms "sold" and "price" indicates that the MNC Provision was not intended to apply when the non-exporting country was a nonmarket economy and normal value is based on a factors-of-production methodology.

Additionally, Commerce noted that if it were to apply the MNC Provision, it would determine the normal value of the subject merchandise by reference to the "normal value at which the foreign like product is sold in substantial quantities from one or more facilities outside the exporting country." Thus, the normal value would be the normal value at which the foreign like product is sold in the PRC or Vietnam or from there to third countries. However, as explained above, in a nonmarket economy country, such as the PRC or Vietnam, Commerce generally does not determine normal value by reference to the prices at which the product is sold; it uses factors of production. Thus, if Commerce "were to base the normal value for the Thai exports on the factors of production of its nonmarket affiliates, it would be treating a market economy country as a nonmarket economy and would, therefore, circumvent [the rules for determining whether a country is a nonmarket economy] and would violate [19 U.S.C. § 1677b(c)], which provides that the factors-of-production methodology applies only when subject merchandise is exported from a nonmarket economy." U.S. Department of Commerce Internal Memorandum from The Team through J. Maeder, to S. Claeys, Case No. A-549-822 at 6 (Jan. 19, 2007). This is further support for Commerce's conclusion that Congress did not intend the MNC Provision to apply when the non-exporting country is

a nonmarket economy and when normal value is based on a factors-of-production methodology.

Finally, Commerce noted that its interpretation is consistent with the legislative history of the MNC Provision. In enacting the MNC Provision, Congress was concerned with the practice of discriminatory pricing where a home market was not viable and yet a respondent's low priced exports to the United States market were supported by higher priced sales of its affiliate(s) in a third country market. See S. Rep. No. 93-1298, at 175, reprinted in 1974 U.S.C.C.A.N. 7186, 7312 ("The low-priced sales to U.S. customers are supported, not by higher-priced sales from the [exporting country] plant, but by higher-priced sales of the same products manufactured in the plants of the company which are located in other [non-exporting] countries."). Commerce observed that this concern did not appear to encompass respondents from nonmarket economy countries, because in nonmarket economy cases, Commerce disregards home market prices and the respondent's cost of production and calculates normal value on the reported factors of production. Put another way, Congress was addressing the problem of discriminatory pricing practices of multinational corporations, but pricing practices are generally irrelevant in nonmarket economies. Accordingly, the legislative history supports Commerce's interpretation.

AHSTAC is correct that Commerce had previously interpreted the MNC Provision differently. See Melamine Institutional Dinnerware Products from the People's Republic of China, 61 Fed. Reg. 43,337, 43,340 (Dep't Commerce Aug. 22 1996) ("Melamine Dinnerware"). Specifically, Commerce concluded that "[t]he structure, language, and legislative history of, and reasons underlying the MNC provision all indicate that it

applies, across the board, to investigations involving both market and non-market economies." U.S. Department of Commerce Internal Memorandum from J. Bialos to R. LaRussa, Case No. A-570-844 at 4 (Aug. 6, 1996). Commerce further opined:

> The plain meaning of this provision thus is that it applies whenever, in any investigation under Title VII, these criteria are met – whether the case involves a market or nonmarket economy. Significantly, there is no explicit exemption from the MNC provision for nonmarket economies, nor does the history of the provision make any reference to the limitations on its applicability.

Id. at 4-5.

An agency is permitted to change its position. See FCC v. Fox Television, 129 S. Ct. 1800, 1811 (2009). In changing practice, "Commerce need not show that its 'reasons for the new policy are better than the reasons for the old one.'" Huvis Corp. v. United States, 570 F.3d 1347, 1355 (Fed. Cir. 2009) (quoting Fox Television, 129 S. Ct. at 1811). Rather, "an agency may deviate from a past practice when 'the new policy is permissible under the statute, . . . there are good reasons for it, and . . . the agency believes it to be better, which the conscious change of course adequately indicates.'" Id. at 1353 (quoting Fox Television, 129 S. Ct. at 1811).

In this case, Commerce addressed its prior conclusion in Melamine Dinnerware that the MNC Provision could be applied to a nonmarket economy. Commerce first noted that it has subsequently declined to follow its Melamine Dinnerware determination. Commerce explained that it "believed that based on the language of the statute and the legislative history . . . , a better reading of the statute is that the MNC [P]rovision was meant to apply only where the [normal value] of the exporting country can be determined pursuant to [19 U.S.C. § 1677b(a)]. Once it is determined that the exporting country is [a nonmarket economy] and that [normal value] is to be determined

on the basis of a factors-of-production methodology under [19 U.S.C. § 1677b(c)], then by its terms, section [19 U.S.C. § 1677b(a)(1)(C)] and the MNC [P]rovision are not applicable."

Because Commerce fully explained how its new construction is permissible under the statute, that there are good reasons for the new construction, and that Commerce believes the new interpretation to be better, we find that Commerce's previous position in <u>Melamine Dinnerware</u> is no obstacle to its current interpretation. Accordingly, we agree with the Court of International Trade that Commerce's interpretation of the MNC Provision is reasonable.

The dissent raises valid concerns as to how Commerce will implement its interpretation in future cases. That is not what we must decide today, however. Our ruling covers the factual situation here: the only non-exporting countries are nonmarket economy countries and normal value is based on a factors-of-production methodology. It is up to Commerce to apply its interpretation appropriately as additional situations warrant.

III

For the foregoing reasons, we conclude that Commerce acted in accordance with law in concluding that the MNC Provision is not applicable when the non-exporting country is a nonmarket economy and normal value is based on a factors-of-production methodology. Accordingly, we affirm the Court of International Trade's judgment upholding Commerce's Final Results.

AFFIRMED.

Costs

No costs.

# United States Court of Appeals for the Federal Circuit

2009-1375

AD HOC SHRIMP TRADE ACTION COMMITTEE,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

THAI I-MEI FROZEN FOODS CO., LTD.,

Defendant.

Appeal from the United States Court of International Trade in case no. 07-00378, Judge Evan J. Wallach.

PROST, <u>Circuit Judge</u>, dissenting.

I respectfully dissent from this opinion because I do not agree with the majority that the agency's decision to create an exception to the Multinational Corporation Provision, 19 U.S.C. § 1677b(d) ("MNC Rule") is a permissible interpretation of a statute such that it is entitled to <u>Chevron</u> deference under the first inquiry of the <u>Chevron</u> test. <u>See</u> <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984).

The MNC Rule consists of three conditions and a directive. <u>See</u> 19 U.S.C. § 1677b(d). If the agency determines that an import scheme meets the three conditions, then the agency must follow the directive for determining the normal value of the imported goods. In the present case, the three conditions are met. The position of the agency is, however, that the agency need not follow the directive, because the

subject goods are imported by a corporation that has affiliates in nonmarket economies and thus presents an exception to the MNC Rule. The agency argues, and the majority agrees, that since the MNC Rule is silent on the issue of whether nonmarket economies are subject to the rule, <u>Chevron</u> applies. The agency then argues, and the majority again agrees, that the agency's interpretation of the MNC Rule as excepting nonmarket economies is reasonable, pointing to words in the directive like "sold" and "price," which are not typically used to describe nonmarket economies. The agency and majority positions in this case are flawed in two respects.

First, agencies are not free to create exceptions to statutes and wrap themselves in <u>Chevron</u>, claiming that the statute is silent as to whether the exception exists. Congress need not explicitly negate all potential exceptions to a given statute in order to ensure that the plain language of the statute is given effect. <u>See, e.g.</u>, <u>United States v. Brockamp</u>, 519 U.S. 347, 350-52 (1997) (declining to read an equitable tolling exception into I.R.C. § 6511). The statute here unambiguously sets forth three conditions for determining when the MNC Rule applies and when it does not. <u>Cf.</u> <u>Barnhart v. Sigmon Coal Co.</u>, 534 U.S. 438, 454 (2002) (rejecting the Social Security Commission's interpretation that the Coal Industry Retiree Health Benefit Act of 1992 applied to successors of signatory operators because the statute clearly stated who may be assigned liability and such successors were not included). Finding that the MNC Rule does not apply to nonmarket economies even when the three conditions are met effectively adds a fourth condition. Commerce's argument is thus no different than arguing that a statute setting forth three conditions is "silent" on whether there is a fourth

condition.[1]  Such a position is illogical and inconsistent with proper statutory interpretation.  See Carcieri v. Salazar, 129 S.Ct. 1058, 1064-65 (2009) (refusing to give Chevron deference to an agency interpretation of a statute where Congress "left no gap in [the statute] for the agency to fill"); 2A Singer, Sutherland Statutory Construction § 7.23 (4th ed. 1984); cf. Elkem Metals Co. v. United States, 468 F.3d 795, 801 (Fed. Cir. 2006) (reading a statute literally without imposing additional restrictions on an agency not found in the statute); FAG Italia S.p.A. v. United States, 291 F.3d 806, 817 (Fed. Cir. 2002) (holding that an agency is not granted statutory authority just because the statute fails to prohibit the agency from acting in a particular way).

It is the prerogative of Congress, not Commerce, to determine whether excepting nonmarket economies promotes the purpose of the MNC Rule, and what the scope of the exception should be.  The purpose of the MNC Rule is to examine prices among multinational affiliates and prevent discriminatory pricing schemes that harm domestic industry.  Nonmarket economy affiliates are not exceptions to the practice of discriminatory pricing, and discriminatory pricing through nonmarket economy affiliates is just as harmful to domestic industry as other multinational pricing schemes.  For instance, just because a corporation is not autonomous in setting prices in a nonmarket economy does not mean that it cannot take advantage of higher prices there to subsidize dumping in the United States.

Second, when an agency interprets a statute, it must do so by articulating some coherent position on the meaning of the statute.  The agency failed to do so in this case.

---

[1]    In this way, the statute is not "silent" on whether the MNC Rule applies to nonmarket economies any more than it is "silent" on whether the MNC Rule applies on Tuesdays.

This failure became particularly clear at oral argument before this court. The agency contended that Thai I-Mei should be excepted from the MNC Rule, arguing that its two affiliates were both nonmarket economies. The agency was unable to articulate, however, any standard for determining when a multinational corporation with affiliates in nonmarket economies would be subject to or excepted from the MNC Rule. The agency took no position, for example, on whether a corporation with several affiliates in market economies and one affiliate in a nonmarket economy would be excepted. In response to a follow-up question about the percentage of nonmarket economy affiliates a multinational corporation might have before the MNC Rule stops being applicable, the agency stated that such a decision would be made on a case-by-case basis. See Oral Argument available at http://oralarguments.cafc.uscourts.gov/mp3/2009-1375.mp3.

The suggestion of the agency that it can decide on a case-by-case basis whether to apply a mandatory rule, where no exceptions to the rule are articulated in the statute, is not the kind of statutory interpretation implicating a Chevron analysis. We cannot decide whether the agency's interpretation of the MNC Rule is reasonable where it has not even articulated a reviewable interpretation. [2]

Granted, it is the responsibility of the agency to determine how to best apply the MNC Rule to a multinational corporation that includes affiliates in nonmarket

---

[2] Because the scope of the agency's exception is unclear, it becomes unclear what practical implications should inform a determination of reasonableness. For example, a large percentage of multinational corporations have an affiliate in China. Excepting every multinational corporation with an affiliate located in China suggests that the majority of multinational corporations may be excepted from the MNC Rule. It also leads to the untenable situation that any multinational corporation can avoid application of the MNC Rule and engage in price discrimination by establishing a nominal affiliate office in a nonmarket economy. Clearly this would not comport with the intent of Congress.

economies. Accordingly, Commerce may determine what kinds of "adjustments" to make to cost of production and normal value, as suggested in the directive clause of the MNC Rule. See 19 U.S.C. § 1677b(d). Commerce may also need, for example, to interpret parts of the directive clause, like "sold" and "price" such that they have meaning in the context of nonmarket economies. See id. Such interpretations would be entitled to Chevron deference. A conditional determination that a particular multinational corporation is not subject to the MNC Rule, however, should not. For these reasons I would reverse the decision of the Court of International Trade and remand the case with instructions to follow the MNC Rule in determining the normal value of Thai I-Mei's imported shrimp products.