# United States Court of Appeals for the Federal Circuit

_____

**GIORGIO FOODS, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**UNITED STATES INTERNATIONAL TRADE COMMISSION,**
*Defendant-Appellee*

**MONTEREY MUSHROOMS, INC.,**
*Defendant-Appellee*

**L.K. BOWMAN COMPANY, MUSHROOM CANNING COMPANY,**
*Defendants*

_____

2013-1304

_____

Appeal from the United States Court of International Trade in No. 03-CV-0286, Chief Judge Timothy C. Stanceu.

_____

Decided: April 24, 2015

_____

MICHAEL TOD SHOR, Arnold & Porter LLP, Washington, DC, argued for plaintiff-appellant. Also represented by SARAH BRACKNEY ARNI.

MARTIN M. TOMLINSON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by STUART F. DELERY, JEANNE E. DAVIDSON, FRANKLIN E. WHITE, JR.

PATRICK VINCENT GALLAGHER, JR., Office of the General Counsel, United States International Trade Commission, Washington, DC, argued for defendant-appellee United States International Trade Commission. Also represented by NEAL J. REYNOLDS, ROBIN LYNN TURNER, DOMINIC L. BIANCHI.

MICHAEL J. COURSEY, Kelley Drye & Warren, LLP, Washington, DC, argued for defendant-appellee Monterey Mushrooms, Inc. Also represented by ROBERT ALAN LUBERDA.

_____

Before DYK, REYNA, and CHEN, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK.

Dissenting opinion filed by *Circuit Judge* REYNA.

DYK, *Circuit Judge.*

Giorgio Foods, Inc. ("Giorgio") appeals a judgment of the Court of International Trade ("Trade Court") dismissing its claims for compensation under the Continued Dumping and Subsidy Offset Act ("the Byrd Amendment"). Because Giorgio failed to indicate support for the antidumping petition as required by the Byrd Amendment, we affirm.

BACKGROUND

We limit the description in the background section to the claims currently on appeal. On January 6, 1998, the Coalition for Fair Preserved Mushroom Trade ("the Coalition") filed an antidumping petition ("the petition") alleging that domestic producers of preserved mushrooms were being injured by imports of certain preserved mushrooms from Chile, China, Indonesia, and India (collectively, "the subject countries") that were being sold in the United States at less than fair value. *See* 19 U.S.C. § 1673. At the time of the petition, Giorgio was the largest domestic producer of preserved mushrooms, accounting for approximately one half of total United States production, but was neither a member of the Coalition nor a petitioner.

On January 16, 1998, the International Trade Commission ("ITC") initiated a material injury investigation concerning imports from the subject countries. *See* Certain Preserved Mushrooms From Chile, China, India, and Indonesia; Institution of Antidumping Investigations and Scheduling of Preliminary Phase Investigations, 63 Fed. Reg. 2693 (USITC Jan. 16, 1998). As part of that investigation, the ITC issued questionnaires to domestic producers of preserved mushrooms, including Giorgio. Giorgio filed its preliminary response on January 22, 1998.[1] The second page of the ITC questionnaire asked, "Do you support or oppose the petition? Please explain" (the "support question"). J.A. 152. It contained three checkboxes for responses: "Support," "Oppose," and "Take no position." *Id.* Giorgio's response to the support question

---

[1] Giorgio's preliminary and final responses to the questionnaire are substantively identical. *Compare* J.A. 151–87 (preliminary), *with* J.A. 188–227 (final). Citations in this opinion will be to Giorgio's preliminary questionnaire.

did not check any of the boxes, but responded in narrative form as follows: "We take no position on Chile, China and Indonesia[.] We oppose the petition against India." *Id.*

In response to the petition, on February 2, 1998, the Department of Commerce ("Commerce") initiated an antidumping investigation, "determin[ing] that the petition [wa]s filed on behalf of the domestic industry." Initiation of Antidumping Investigations: Certain Preserved Mushrooms From Chile, India, Indonesia, and the People's Republic of China, 63 Fed. Reg. 5360, 5361 (Dep't of Commerce Feb. 2, 1998) (citing 19 U.S.C. § 1673a(b)(1)). A petition is only filed

> on behalf of the industry, if—
>
>> (i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and
>>
>> (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

19 U.S.C. § 1673a(c)(4)(A)(i)–(ii). Commerce noted that "supporters of the petition account[ed] for over 50 percent of production of the domestic producers who ha[d] expressed an opinion even if Giorgio's position [was] not disregard[ed]," i.e., even if Giorgio were included in the category of domestic producers not supporting the petition. 63 Fed. Reg. at 5362.

On October 22, 1998, and December 31, 1998, Commerce published final determinations in the four preserved mushroom antidumping investigations, finding that dumping had occurred with respect to each of the

subject countries.[2]  Between December 1998 and February 1999, the ITC determined that the domestic mushroom industry was materially injured by the import of mushrooms from the subject countries,[3] and Commerce issued corresponding antidumping orders.[4]  Pursuant to

---

[2]    *See* Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms from Chile, 63 Fed. Reg. 56,613 (Dep't of Commerce Oct. 22, 1998); Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms from India, 63 Fed. Reg. 72,246 (Dep't of Commerce Dec. 31, 1998); Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms from the People's Republic of China, 63 Fed. Reg. 72,255 (Dep't of Commerce Dec. 31, 1998); Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms from Indonesia, 63 Fed Reg. 72,268 (Dep't of Commerce Dec. 31, 1998).

[3]    *See* Certain Preserved Mushrooms from Chile, 63 Fed. Reg. 66,575 (USITC Dec. 2, 1998); Certain Preserved Mushrooms from China, India, and Indonesia, 64 Fed. Reg. 9,178 (USITC Feb. 24, 1999).

[4] *See* Notice of Antidumping Duty Order: Certain Preserved Mushrooms from Chile, 63 Fed. Reg. 66,529 (Dep't of Commerce Dec. 2, 1998); Notice of Amendment of Final Determination of Sales at Less than Fair Value and Antidumping Duty Order: Certain Preserved Mushrooms from the People's Republic of China, 64 Fed. Reg. 8308 (Dep't of Commerce Feb. 19, 1999); Notice of Antidumping Duty Order: Certain Preserved Mushrooms from Indonesia, 64 Fed. Reg. 8310 (Dep't of Commerce Feb. 19, 1999); Notice of Amendment of Final Determination of Sales at Less than Fair Value and Antidumping Duty Order: Certain Preserved Mushrooms from India, 64 Fed. Reg. 8311 (Dep't of Commerce Feb. 19, 1999).

these antidumping orders, the U.S. Customs and Border Patrol ("Customs") collected final antidumping duties for imports from the subject countries. *See, e.g.*, Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 66 Fed. Reg. 40,782 (Customs Aug. 3, 2001).

For entries filed between October 1, 2000, and October 1, 2007, the Byrd Amendment required that Customs collect final duties under antidumping duty orders for distribution to "affected domestic producers." 19 U.S.C. § 1675c(a) (2000).[5] To qualify as an affected domestic producer under the Byrd Amendment, an entity was required to demonstrate that it "was a petitioner or interested party in support of the petition with respect to which an antidumping duty order . . . has been entered." *Id.* § 1675c(b)(1)(A) (hereinafter, "the support requirement"). The Byrd Amendment directed the ITC to provide Customs with a list of affected domestic producers, which includes "a list of petitioners" and "a list of persons that indicate support of the petition by letter or through questionnaire response." *Id.* § 1675c(d)(1). Those entities would receive Byrd Amendment distributions.

On October 2, 2001, Giorgio requested that the ITC place it on the list of affected domestic producers.[6] The

---

[5] The Byrd Amendment was repealed in February 2006, but the repeal did not affect duties on entries of goods made prior to October 1, 2007. Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601, 120 Stat. 4, 154 (2006).

[6] Giorgio's initial request was limited to Chile, China, and Indonesia, and did not include India. According to Giorgio's second amended complaint, it did not file for Byrd Amendment distributions with respect to India for 2001 "because it would have been futile for it to do so."

ITC denied Giorgio's request on the basis that "Giorgio's questionnaire responses in the original investigations do not indicate support for the petition . . . ." J.A. 244. Because Giorgio was not on the ITC list, Customs denied Giorgio's claims for Byrd Amendment distributions.

Giorgio brought suit in the Trade Court on May 23, 2003, challenging the ITC's refusal to include it on the list of affected domestic producers for the preserved mushroom antidumping orders and alleging that the ITC's refusal to include it on the list violated the First Amendment. The case was stayed pending this court's decisions in *SKF USA, Inc. v. United States Customs & Border Protection*, 556 F.3d 1337 (Fed. Cir. 2009), and *PS Chez Sidney, L.L.C. v. United States International Trade Commission*, 684 F.3d 1374 (Fed. Cir. 2012).

Thereafter, in *SKF*, we upheld the Byrd Amendment against a facial First Amendment challenge. 556 F.3d at 1349, 1360. We employed a saving construction to the Byrd Amendment to avoid constitutional questions by construing it to provide "distributions to those who actively supported the petition (i.e., a party that did no more than submit a bare statement that it was a supporter without answering questionnaires or otherwise actively participating would not receive distributions)." *Id.* at 1353 n.26. Under this construction, the court found the support requirement constitutional under the standards governing commercial speech because it directly advanced the government's substantial interest in preventing dumping by rewarding parties who assist in trade law enforcement. *Id.* at 1354–55. We analogized the Byrd Amendment to qui tam actions and attorney's fee-shifting statutes. *Id.* at 1359.

---

J.A. 84. Beginning in 2003, however, Giorgio sought distributions for India as well.

On June 7, 2011, following our decision in *SKF*, Giorgio moved to file a second amended complaint, seeking to add a statutory claim that the ITC had violated the Byrd Amendment by relying solely on Giorgio's response to the support question in determining whether to include Giorgio on the list of affected domestic producers. According to the second amended complaint, Giorgio "agreed [with the petitioners] to provide support for [the antidumping petition] without publicly identifying itself as a petitioner." J.A. 73. Instead, the complaint alleged that Giorgio supported petitioners' efforts in other ways, including responding to the ITC questionnaire, contributing to petitioners' legal fees, providing confidential commercial information to petitioners, and accompanying ITC investigators and petitioners' counsel on a site visit of Giorgio's facilities. Giorgio continued to assert an as-applied First Amendment challenge, alleging that denial of payments under the circumstances violated the First Amendment.

On November 17, 2011, the Trade Court denied Giorgio's motion to add its statutory claim as futile because it failed to state a claim in light of *SKF*. *Giorgio Foods, Inc. v. United* States, 804 F. Supp. 2d 1315, 1321–22 (Ct. Int'l Trade 2011). And on March 6, 2013, the Trade Court granted motions to dismiss all of Giorgio's claims. *Giorgio Foods, Inc. v. United States*, 898 F. Supp. 2d 1370, 1382 (Ct. Int'l Trade 2013). If Giorgio lost this case, its share of Byrd Amendment distributions would go to other domestic producers. Giorgio appeals the denial of its motion for leave to amend its complaint to add its statutory claim and the dismissal of its second amended complaint, alleging a First Amendment violation.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). We review de novo both the Trade Court's dismissal for failure to state a claim and its denial of leave to amend on grounds of futility. *See Ashley Furni-*

*ture Indus., Inc. v. United States*, 734 F.3d 1306, 1309 (Fed. Cir. 2013), *cert. denied*, 135 S. Ct. 72 (2014). We also exercise de novo review over questions of statutory or constitutional interpretation. *Id.*

DISCUSSION

I

Giorgio argues that, although it stated in its questionnaire response that it opposed the petition against India and took no position with respect to Chile, China, and Indonesia, its petition response "as a whole," combined with its other actions in support of the petition, satisfied the Byrd Amendment's support requirement. Appellant's Br. 31–33. Giorgio argues that because it provided support for the petition "behind the scenes," it should be treated as a "latent petitioner." Appellant's Br. 5. Thus, the question here is whether a statement of support is necessary to secure compensation under the Byrd Amendment. On that question, we do not write on a blank slate; three prior decisions of this court have addressed the support requirement.

In *SKF*, SKF USA ("SKF"), a domestic producer of goods that were subject to an antidumping duty order, was denied distributions under the Byrd Amendment because the ITC and Customs determined that SKF had neither been a petitioner nor supported the petition at issue. 556 F.3d at 1340. In response to the ITC's questionnaire, SKF had stated that it opposed the petition. *Id.* at 1343. Under these circumstances, we found that SKF had not met the support requirement and was therefore not entitled to Byrd Amendment distributions because "Congress could permissibly conclude that it is not required to reward an opposing party." *Id.* at 1358. We found that the Byrd Amendment "did not compensate all injured domestic producers, but only those who filed an antidumping petition and those who supported it." *Id.* at

1351. We made clear that merely responding to a questionnaire did not constitute the necessary support: "At best the role of parties opposing (or not supporting) the petition in responding to questionnaires is similar to the role of opposing or neutral parties in litigation who must reluctantly respond to interrogatories or other discovery." *Id.* at 1359. Indeed, under ITC regulations, "[a]ny questionnaire issued by the Commission in connection with any investigation . . . may be issued as a subpoena . . . ." 19 C.F.R. § 207.8. This provision further allows the ITC to—among other things—pursue judicial enforcement, if the ITC determines that a party has failed to "respond adequately." *Id.*

In *Chez Sidney*, the plaintiff checked the "support" box in its preliminary response, which Commerce may rely on in order to determine whether the requirements of 19 U.S.C. § 1673a(b)(1) are satisfied for purposes of initiating an investigation, but checked the "take no position" box in its final response. *See* 684 F.3d at 1377, 1382. The ITC denied a distribution, *id.* at 1377–78, but we held that the producer qualified for distributions because it "indicat[ed] in its preliminary questionnaire response that it supported the petition . . . ." *Id.* at 1379. In holding that the producer had satisfied the support requirement, we specifically relied on the fact that it "expressed abstract support in the preliminary response" and "never expressed that it opposed the petition." *Id.* at 1383. We found that checking the "support" box in the preliminary questionnaire was sufficient to constitute "active support" under *SKF*. *Id.* at 1381 (citing *SKF*, 556 F.3d at 1353 n.26).

Finally, in *Ashley*, Ashley Furniture, Inc. ("Ashley Furniture") checked the "oppose" box on its questionnaire response, whereas Ethan Allen Global, Inc. and Ethan Allen Operations, Inc. (collectively, "Ethan Allen") checked the "take no position" box. 734 F.3d at 1308. The

ITC denied distributions. *Id.* at 1309. We held that neither producer satisfied the support requirement. With respect to Ashley Furniture, we explained that a finding that a producer that checked "oppose" was an affected domestic producer would "lead to the incongruous conclusion that a producer who indicates only opposition to the petition in questionnaires—the polar opposite of support—is nevertheless a supporter." *Id.* at 1311. And with respect to Ethan Allen, we explained that "[t]he conclusion that a producer who indicates that it 'takes no position' in a questionnaire is a supporter is also incongruous because such a producer has not 'indicated support.'" *Id.*

We held that "a producer who never indicates support for the petition by letter or through questionnaire response cannot be an [affected domestic producer]" because "a producer's 'bare statement that it was a supporter' is a necessary (though not a sufficient) condition to obtain [affected domestic producer] status." *Id.* (quoting *SKF*, 556 F.3d at 1353 n.26). Notably, both producers in *Ashley* failed to satisfy the support requirement despite the fact that they too assisted the ITC investigation by providing information. *See id.* at 1314 (Clevenger, J., dissenting) ("Ethan Allen provided supporting data to the ITC in the form of sales and production data . . . . Ashley Furniture provided important sales and production data to the ITC, assisting the ITC in determining if the wooden bedroom furniture industry was injured by dumping.").

In this case, Giorgio's arguments are foreclosed by *Ashley*, because Giorgio failed to satisfy the statutory support requirement by indicating support "by letter or through questionnaire response." 19 U.S.C. § 1675c(d)(1). There are no statements of explicit support in Giorgio's responses, but Giorgio argues that its answers to the questions concerning injury "are not statements that would be made by one opposing a petition." Appellant's Br. 9 (quoting J.A. 78). In this connection, Giorgio points

to statements in its responses such as, "[d]ue to the extremely low and prevailing depressed prices for preserved mushrooms caused by imported preserved mushrooms, [Giorgio] was forced to discontinue production of its line of 68 oz. preserved mushrooms," J.A. 154, and that "eroding profits due to extremely low and depressed prices caused by imported mushrooms[] will make future plans for expansion and banking requests more difficult to obtain," J.A. 163. But those statements do not indicate support. Factual statements that indicate *injury*, helpful as those may be in making the final dumping determination, are not the same as statements that indicate *support* for the petition. *See SKF*, 556 F.3d at 1351 & n.22.

Although the statute focuses exclusively on parties who "indicate support of the petition by letter or through questionnaire response," 19 U.S.C. § 1675c(d)(1), Giorgio further relies on "other actions it took during the ITC's underlying investigation," including the payment of petitioners' legal fees and providing confidential information to petitioners, to satisfy the support requirement. Appellant's Br. 31. Even accepting Giorgio's allegations in the complaint as true, financial and other forms of support for the petitioners are not the same as "indicat[ing] support of the petition *by letter or through questionnaire response*." 19 U.S.C. § 1675c(d)(1) (emphasis added). As *Ashley* held, forms of support other than explicit statements of support in the petition are irrelevant in determining whether a producer satisfied the support requirement. *See Ashley*, 734 F.3d at 1311. There is nothing in the Byrd Amendment, or its legislative history, that indicates congressional intent to compensate all parties, including those who did not make an explicit statement of support for the petition. *See SKF*, 556 F.3d at 1350–51.

Unlike the producer in *Chez Sidney*, 684 F.3d at 1383, Giorgio *never* expressed affirmative support for the peti-

tion. *See Ashley*, 734 F.3d at 1311–12 ("*Chez Sidney* repeatedly referred to the fact that the producer expressed affirmative support for the petition *at one point— i.e.*, in the preliminary questionnaire."). With respect to India, Giorgio's position is the same as that of Ashley Furniture, which also answered "oppose" on its response to the ITC questionnaire. *Id.* at 1308. With respect to Chile, China, and Indonesia, Giorgio's position is the same as that of Ethan Allen, which also answered "take no position" in its response to the ITC questionnaire. *Id. Ashley* held that neither position taken by Giorgio in this case—opposition or the lack of a position—satisfied the support requirement for Byrd Amendment distributions. *Id.* at 1311.

## II

Giorgio also argues that requiring a statement of support violates the First Amendment as applied to Giorgio. This argument is also foreclosed by *Ashley*, which correctly held that such a requirement does not violate the First Amendment as applied to a producer that failed to indicate support. 734 F.3d at 1310–11. A statement of support is not an abstract statement of viewpoint, but rather one that has consequences. Those consequences are of two types.

First, statements of support for the petition or the lack of such statements can be, and in this case were, taken into account by Commerce in determining whether the statutory support requirements for the petition were satisfied. The statute imposes a requirement of statements of industry support amounting to 25% of the domestic producers in the relevant industry before Commerce can initiate an antidumping investigation. *See* 19 U.S.C. § 1673a(c)(4)(A)(i)–(ii). Here, Giorgio filed its preliminary response to the ITC questionnaire on January 22, 1998, prior to Commerce's February 2, 1998,

industry support determination. Commerce considered Giorgio's questionnaire response in determining that a sufficient percentage of the domestic industry neverthe- less supported the petition. 63 Fed. Reg. at 5362.

Second, in applying the threat of material injury standard, the ITC is required in every case to take ac- count of the publicly stated support, opposition, or no position responses in the ITC questionnaire, as we explic- itly held in *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 984 (Fed. Cir. 1994).[7]  In *Suramerica*, none of the industry members checked the support box, one industry member expressed opposition, and the rest did not take a position. *Id.* at 981. We held that "domestic industry support for the petitions" was a factor "required by the statute" in determining whether there was a threat of material injury to the industry. *Id.* at 984. We explained that "[t]he industry best knows its own economic interests and, therefore, its views can be considered an economic factor. Indeed an industry's failure to acknowledge an affirmative threat has direct

---

[7]    As the dissent points out, in making a "material injury" determination as opposed to a "threat of material injury" determination, the statute provides only that the ITC "may consider such other economic factors as are relevant to the determination." 19 U.S.C. § 1677(7)(B)(ii). The fact that the ITC might not consider the question- naire responses in making a material injury determina- tion hardly diminishes their significance to the threat of material injury determination. Here, as in *Suramerica*, 44 F.3d at 981, the ITC was asked to consider both possi- bilities, "whether there is a reasonable indication that imports" from each of the subject countries "are causing material injury, or threatening to cause material injury, to a U.S. industry." 63 Fed. Reg. at 5363.

significance." *Id.* "Moreover, publicly expressed industry support for the petition, or lack of it, is probative evidence of those views." *Id.* Thus, "[i]n making a determination of threat of material injury, ITC must weigh industry views and views of other interested parties . . . ." *Id.*

Significantly, in *Suramerica*, "[s]ome industry members expressed additional views on the petitions in private statements," which in some instances "clarified a producer's reasons for withholding support from the petitions." *Id.* at 982. These private indications that may contradict the public position do not eliminate the significance of the public position. As we said, "[t]hat the industry is not willing to express public support is evidence that it does not perceive a real threat of immediate harm. Private statements of support, but for other interests, can diminish but not eliminate the probative value of this relevant evidence." *Id.* at 984 n.2.

Given the real world consequences of a statement of public support (or the lack thereof) Congress is clearly not relying on an abstract expression of views.[8] Here, as in

---

[8]    *See Ashley*, 734 F.3d at 1311 ("As *SKF* explained, the Byrd Amendment does not reward neutral or opposing parties because filling out the questionnaire without indicating support for the petition can contribute to the petition's defeat. Indeed, the ITC takes the level of support of the petition into account in its determination of material injury, and the petition cannot be considered as filed 'on behalf of the industry' unless at least 25% of the domestic producers in the relevant industry sector indicate support." (citations omitted)); *Chez Sidney*, 684 F.3d at 1382 ("[A] producer's expression of support in the response to the preliminary questionnaire is critical to the determination of whether to commence an investigation of an antidumping petition."); *SKF*, 556 F.3d at 1340 n.1.

*Ashley*, Giorgio's as-applied First Amendment challenge fails because "the government did not deny Byrd Amendment distributions to [Giorgio] solely on the basis of abstract expression." 734 F.3d at 1310.

In an analogous context, it could hardly be contended that False Claims Act payments and attorney's fees (31 U.S.C. § 3730(d)) would be available to a party, such as Giorgio, that sat on the sidelines and refused to take an open and active role in support of the government. *See SKF*, 556 F.3d at 1356–57 ("[T]he Byrd Amendment—like qui tam proceedings, monetary awards of a portion of the government's recovery, and awards of attorney's fees— shifts money to parties who successfully enforce government policy."). There is nothing in the First Amendment that requires the government to accommodate Giorgio's "business reasons" for not making a public statement in support of the petition. Appellant's Br. 10.

For these reasons, we affirm both the denial-in-part of Giorgio's motion to amend the complaint and the dismissal of Giorgio's complaint for failure to state a claim.

## AFFIRMED

### COSTS

Costs to appellees.

# United States Court of Appeals
# for the Federal Circuit

---

**GIORGIO FOODS, INC.,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

**UNITED STATES INTERNATIONAL TRADE
COMMISSION,**
*Defendant-Appellee*

**MONTEREY MUSHROOMS, INC.,**
*Defendant-Appellee*

**L.K. BOWMAN COMPANY, MUSHROOM CANNING
COMPANY,**
*Defendants*

---

2013-1304

---

Appeal from the United States Court of International Trade in No. 03-CV-0286, Chief Judge Timothy C. Stanceu.

---

REYNA, *Circuit Judge, dissenting.*

Appellant appeals the decision of the Court of International Trade that found it ineligible to qualify for a distribution share under the Continued Dumping and Subsidy Offset Act. The majority affirms the trial court while I conclude that Appellant has established a plausible claim that it is an affected domestic producer eligible to receive such a distribution. The majority's approach evidences a fundamental misunderstanding concerning initiation of antidumping investigations and improperly rewrites the statute to reach an outcome that is contrary to the Congressional purpose of the Continued Dumping and Subsidy Offset Act, the precedent of this court, and the freedoms of expression guaranteed under the First Amendment.

The trial court dismissed Appellant's statutory and First Amendment claims for failure to state a claim pursuant to Rule 12 of the Rules of the Court of International Trade. At this stage, Giorgio is only required to allege sufficient facts to establish a plausible claim that it is an ADP under the CDSOA. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A significant problem is that the majority consistently seeks to address the merits of the case, *i.e.*, whether Giorgio is entitled to disbursements, not whether Giorgio makes a plausible claim for relief. As I describe below, I conclude that Giorgio has established a plausible claim for relief, not that Giorgio is necessarily entitled to disbursements. For these reasons, I respectfully dissent.

## I.      INDICATING INDUSTRY SUPPORT

Congress enacted the Continued Dumping and Subsidy Offset Act[1] ("CDSOA" or the "Byrd Amendment") to

---

[1]   *See* Pub.L. No. 106–387, §§ 1001–1003, 114 Stat. 1549, 1549A–72 to –75 (codified at 19 U.S.C. § 1675c

ameliorate the injurious effects of dumping and illegal subsidies by distributing portions of collected antidumping and countervailing duties to U.S. producers of the affected industry. *See* Pub. L. No. 106-387, § 1002. To be sure, Congress intended that the remedial effect of CDSOA distributions would be distinct from the remedial trade relief afforded under U.S. trade laws.[2] The former provides company-specific relief by assisting U.S. producers affected by dumping to rebuild, while the latter provides relief to the affected industry as a whole by raising the price of imports found to have been dumped.

Specifically, the CDSOA provides that "[d]uties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures." 19 U.S.C. § 1675c(a). The statute is clear on its face that to receive distributions, a producer must first be an "affected domestic producer" and must certify that it desires to receive distributions, that it has not previously requested distributions for the qualifying expenditures it now seeks, and that it is eligible to receive distributions as an "affected domestic producer." 19 U.S.C. § 1675c(d)(2). This case, like its predecessors, focuses on the interpretation of "affected domestic producer" (ADP). The precise question on appeal is whether Giorgio has established a plausible claim that it is an ADP under the CDSOA

---

(2000)), *repealed by* Deficit Reduction Act of 2005, Pub.L. No. 109–171, § 7601, 120 Stat. 4, 154 (Feb. 8, 2006) (effective Oct. 1, 2007).

[2] The CDSOA addresses antidumping and countervailing investigations. 19 U.S.C. §§ 1671, 1673. For the most part, this opinion refers to both by its reference to "antidumping."

To qualify as an ADP, a producer must have been a "petitioner or interested party in support of the petition." 19 U.S.C. § 1675c(b)(1)(A). The CDSOA directs the United States International Trade Commission ("ITC" or "Commission") to forward to U.S. Customs and Border Protection ("Customs") a list of ADPs. 19 U.S.C. § 1675c(d)(1). Customs then distributes the collected antidumping duties to listed ADPs who have provided the requisite certifications. 19 U.S.C. § 1675c(d)(3). For non-petitioners to be on this list, the CDSOA requires that the producer be an interested party and "indicate support of the petition" by letter or, as is relevant here, "through questionnaire response." 19 U.S.C. § 1675c(d)(1).

The generality of this provision is notable; Congress only required that an interested party "indicate" support.[3] During an antidumping investigation, both the ITC and the Department of Commerce ("Commerce") send questionnaires to domestic producers at the preliminary and final stages of their respective investigations. The CDSOA does not specify which agency's questionnaire responses must include the indication of support. Nor does it specify whether the questionnaire is the preliminary questionnaire or the final questionnaire. Most important, the CDSOA does not specify how a producer must indicate support—it only requires that the producer "indicate" support through the questionnaire response.[4]

---

[3]    An interested party is, for the purposes of this appeal, a U.S. producer of the like product subject to the antidumping investigation. 19 U.S.C. §1677c. There is no dispute that Giorgio is an "interested party."

[4]    "Indicate" means to "point out," "show indirectly," or "state briefly." The Merriam-Webster Dictionary 386 (2004).

For decades, the ITC's questionnaires have contained a petition support question that asks "Do you support or oppose the petition? Please explain." *See* J.A. 152, 189 (Giorgio's ITC questionnaire responses). The questionnaire provides boxes next to "Support," "Oppose," or "Take no position," as well as three lines where a producer can provide statement(s). To provide an example, I set out below the petition support question from Giorgio's response to the preliminary questionnaire.[5]

> Do you support or oppose the petition? Please explain.
>
> ☐ Support    ☐ Oppose    ☐ Take no position
>
> We take no position on Chile, China and Indonesia
>
> We oppose the petition against India

In passing the CDSOA, Congress did not refer to the ITC questionnaire, much less the ITC support boxes. Nor did Congress provide any guidance, for example, as to what happens if a U.S. producer checks the take no position box and then writes "please issue an antidumping order." This is important because the majority opinion focuses on whether a box was checked or not. It is clear, however, that Congress could not have intended that the petition support requirement would hinge one way or another on the boxes. The ITC has used generally the same questionnaires at least as far back as the 1980s, well before the passage of the CDSOA in 2000. *SKF USA, Inc. v. U.S. Customs & Border Prot.*, 556 F.3d 1337, 1357–58 (Fed. Cir. 2009). Stated differently, the support boxes

---

[5]    Giorgio's answer to the petition support question in the final questionnaire was identical. J.A. 189. Giorgio did not check any of the boxes.

existed over 15 years before the passage of the CDSOA. The boxes were not created for or by the CDSOA, nor did Congress designate the boxes as the place for indication of support of a petition. Indeed, the boxes are but a small, insignificant part of what is otherwise a questionnaire that calls for highly technical, complex, company-specific data that is often business proprietary information, as well as general industry, publically-available trade data and private market research data.

On the other hand, the boxes alone provide no meaningful data or measurement towards a finding of material injury, the goal of any worthy antidumping petition. Had Congress wanted to make the ITC petition support question determinative of support for CDSOA purposes, it would have explicitly done so. But it did not. There is no indication in the statute or the legislative history that Congress intended that checking a box would determine whether one was an ADP.

It is unjust to penalize a U.S. producer like Giorgio who submitted its questionnaire response two years before the CDSOA was enacted and had no clue that its answer to that one question would cost it CDSOA distributions.[6] Congress could not have intended such a result.[7] Yet, that is the result mandated by the majority.

---

[6] In a trade case, there are a number of factors that U.S. producers consider as to whether they should publically or privately express support for a dumping petition. Thus, while a producer can lend economic and evidentiary support for the petition, it may choose, for commercial purposes having nothing to do with its support, not to publically support the petition out of fear of losing U.S., foreign, or downstream customers. *See e.g.,* Oral Argument at 5:20–6:10. Stated differently, the answer to the ITC support question may be based entirely on business

## II.    REWRITING THE STATUTE

The majority holds that to meet the support requirement, a producer's ITC questionnaire responses must include a statement of "explicit" support. Maj. Op. at p. 11. The majority is careful not to hinge support on whether a specific box is checked or to explain what constitutes a statement of explicit support. The explicit support rule instead *suggests* that statements of explicit support may be found somewhere in the ITC questionnaire responses.

I respectfully dissent from my colleagues' rewriting of the statute to require a statement of "explicit" support. The statute does not contain such a requirement, just as the statute does not mandate that a specific box be checked. To the contrary, the plain language of the statute on its face requires the producer to "indicate" support through questionnaire response. The Supreme Court has repeatedly cautioned against departing from the plain language of a statute. *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011); *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 193–94 (1978). Under the majority opinion, the legal issue of whether a U.S. producer has indicated support through a questionnaire

---

or litigation strategy and have nothing to do with whether a company supports the petition.

7    Indeed, Congress's findings included in the statute strongly suggest that Congress intended that U.S. producers like Giorgio would receive distributions. Congress feared that domestic producers would lay off workers and would be reluctant to reinvest or rehire. *See* Pub. L. No. 106-387, §§ 1002. As described below, that is precisely what Giorgio alleges occurred here: the dumped imports forced it to lay off workers and threatened to put it out of business.

turns on whether a statement of support is "explicit." This new rule is nowhere in the statute.

### III.    EVIDENCE INDICATING SUPPORT

The question here is whether Giorgio indicates support for the petition through its questionnaire response(s). The answer is yes. As this Court noted in *PS Chez Sidney*, whether a questionnaire response indicates support is determined by the substance of the response as a whole, *i.e.,* through the questionnaire. *PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, 684 F.3d 1374, 1379, 1382–83 (Fed. Cir. 2012).

Giorgio's questionnaire responses provide data and argument that supports a finding of material injury, or threat thereof, which leads to the issuance of an anti-dumping duty order.  Giorgio submitted detailed, company-specific financial data concretely showing the decreasing value of its shipments, decreased wages, increased inventories, and decreased net income and profits. J.A. 155, 162, 165–66, 194, 200, 204–06.  Giorgio explained that its net sales decreased from about $ 74.9 million in fiscal year (FY) 1995 to about $ 48 million in FY 1997, a decrease of $ 26.9 million or about thirty-six percent (36%). J.A. 162, 200. During this time, its total cost of goods sold fell from about $ 60.5 million to about $ 40 million and gross profits shrunk from about $ 14.4 million to about $ 8 million, or a loss of about forty-four percent (44 %). J.A. 162, 200. These are precisely the type of data that prove material injury during an investigation.

The majority dismisses these data as being merely "factual statements," and not statements that indicate support for the petition. Maj. Op. at pp. 11–12. However, there is no reason why empirical data, factual information, and legal argument cannot indicate support. This remarkable position defies a fundamental tenet of U.S. law that recognizes that facts speak louder than words.

*Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In trade law, the game is in the data. Factual statements corroborated by data are evidence that carry determinative weight. One could even say that the data in a producer's questionnaire responses speaks so loud, one cannot hear what the producer is saying.

The majority is incorrect that Giorgio's questionnaire response does not indicate support. Indeed, Giorgio's questionnaire response can reasonably and fairly be said to constitute, in its entirety, a statement of "explicit support" for the petition. Giorgio states that the investigated imports "diminish or extinguish our ability to remain in business." J.A. 164, 202. Giorgio was forced to discontinue a product line and decrease production at numerous facilities because of the "extremely low" and "prevailing depressed" prices caused by the subject imports, thereby forcing Giorgio to "layoff numerous employees." J.A. 154, 191. These layoffs were needed in light of the "depressed times in the domestic preserved mushroom industry" caused by the dumped imports. J.A. 154, 191. Even after layoffs, "if the downward trend [in net sales] continues or does not show any improvement Giorgio Foods, Inc. could be forced to close its operations." J.A. 154, 191.

These are explicit statements of material injury and demonstrate open, explicit support of the petition by a domestic producer of the like product. When one considers that the statements were made *two years prior* to the enactment of the CDSOA, logic dictates that these substantive statements constitute a plausible indication of support. That the majority turns a blind eye to these explicit statements shows that it focused exclusively on the petition support question boxes. The majority's approach, relying on abstract expressions of support, is contrary to our precedent.

IV.    IGNORING PRECEDENT

Our precedent emphasizes an inclusive reading of the petition support requirement that assesses support based on actions, not specific words. In *SKF*, we considered a First Amendment constitutional challenge to the CDSOA's support requirement. *SKF USA, Inc. v. U.S. Customs & Border Protection*, 556 F.3d 1337 (Fed. Cir. 2009). We recognized that a statute is likely unconstitutional if its purpose is to penalize viewpoint expression. As a result, we held that the CDSOA rewards actions in support of litigation, not "abstract expression of support"—essentially focusing on the substance of the producer's responses, not their form. *Id.* at 1353. Thus, the Court in *SKF* sidestepped the constitutional issues concerning requiring viewpoint expression by focusing on action in support of litigation. *SKF*, 556 F.3d at 1353. Yet, in this case, the majority sidesteps "action in support of litigation," and instead imposes a viewpoint-based expression of support requirement.

The majority's opinion prizes form over substance; it prefers nonfactual (*i.e.,* abstract) expressions of support over actions that support litigation. Whether to label a statement as *explicit* support or as a statement that *indicates* support is immaterial where both depend entirely on the abstract form of the expression. Here, the majority determines that action that supports litigation is not an explicit statement of support. As a result, the *SKF* case and the majority opinion are in direct conflict and irreconcilable.

Today's "statement of explicit support" holding also contravenes this Court's holding in *PS Chez Sidney*. In *PS Chez Sidney*, we held that a producer may qualify as an ADP even though it answered "Take no position" to the petition support question in its final ITC questionnaire response. *PS Chez Sidney, L.L.C. v. U.S. Int'l Trade*

*Comm'n*, 684 F.3d 1374, 1379, 1383 (Fed. Cir. 2012). To ensure that the CSDOA furthered its goal of "assist[ing] domestic producers," we stressed an "inclusive reading" of the statute. *Id.* at 1382. We explained in *PS Chez Sidney* that "it is the surrounding circumstances, not abstract statements of support alone, upon which an appropriate support determination depends." *Id.* at 1382–83. Here, the majority ignores the significant evidence of Giorgio's actions that supported the petition and instead seeks out explicit statements of support.[8] As a result, the majority opinion is in direct and irreconcilable conflict with this Court's decision in *PS Chez Sidney*.

In *Ashley Furniture*, we considered statutory and constitutional challenges by two domestic producers, Ashley and Ethan Allen, which answered the petition support question "Take no position" and "Oppose," respectively. *Ashley Furniture Indus., Inc. v. United States*, 734 F.3d 1306, 1308 (Fed. Cir. 2013), *cert. denied*, 135 S. Ct. 72 (2014). Upon noting that the producer in *PS Chez Sidney* checked the support box in its preliminary questionnaire response (but not in the final questionnaire), this Court in *Ashley Furniture* held that a producer who "never indicates support for the petition by letter or through questionnaire response cannot be an ADP." *Id.* at 1311–12 (internal citations omitted).

---

[8] Giorgio's support of the petition is further confirmed by other supporting actions, including contributing legal fees incurred by the petitioners in the antidumping proceedings (J.A. 74, ¶ 34); providing confidential business information that was included in the petition (J.A. 76, ¶ 42); participating in pre-initiation meetings with the petitioners (J.A. 76, ¶ 41); and hosting ITC staffers for a plant field visit and tour (J.A. 77, ¶ 43).

The majority bases much of its holding on *Ashley Furniture*, concluding that it "foreclose[es]" Giorgio's arguments. Maj. Op. 11. *Ashley Furniture*, however, presented wholly different facts than those of this case. Notably, there was no showing in *Ashley Furniture* of actions taken in support of the petition. Nor did the Court provide any analysis of Ashley's and Ethan Allen's questionnaire responses beyond the petition support question. Instead, *Ashely Furniture* concluded that the questionnaire response must at least include "a bare statement" of support. *Ashley Furniture*, 734 F.3d at 1311. Here, the majority alters the "bare statement of support" requirement to achieve statement of "explicit support," thereby rendering the holding in this case inconsistent with *Ashley Furniture*.

In sum, the explicit support rule is contrary to our precedent, and, as I describe below, renders the CDSOA unconstitutional. These constitutional concerns bolster my conclusion that the majority's interpretation of the CDSOA is incorrect. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.") (internal citations omitted).

## V. CONSTITUTIONALITY OF THE CDSOA

In *SKF*, we held that the constitutionality of the CDSOA's petition support requirement under the First Amendment is assessed under the commercial speech doctrine. *SKF*, 447 F.3d at 1355.[9] Under this doctrine, the

---

[9] Being bound by precedent, I accept this holding, but for the reasons that Judge Linn provided in his

regulation must "directly advance[]" a substantial government interest. *Id.* (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980)). In *SKF*, we held that the petition support requirement directly advances the government interest in preventing dumping by rewarding parties who assist in antidumping enforcement. *SKF*, 447 F.3d at 1355. To avoid the constitutional challenge, the Court in *SKF* focused on whether a party "assists," or takes action in support of the petition, not whether a party "expresses support" for the petition. *See SKF*, 556 F.3d at 1353.

Giorgio argues that this case presents a related, but different constitutional question: whether it is constitutional to determine petition support entirely on the presence of a statement of explicit support. *See* Appellant's Br. 57. The majority rejects this challenge on the basis that a statement of explicit support "has consequences" that are of "two types" that furthers the Government's interest in enforcing the antidumping laws. Maj. Op. at 13. First, it influences Commerce's decision as to whether the petition has the requisite industry support. *Id.* Second, it influences the ITC's material injury determination. *Id.* These assertions reflect a fundamental misunderstanding on how antidumping investigations are conducted.

The ITC questionnaire response does not affect whether Commerce initiates an investigation.[10] First, it

---

thoughtful dissent, I believe that the CDSOA should be subjected to strict scrutiny, not evaluated under the commercial speech doctrine. *SKF*, 556 F.3d at 1370 (Linn, J., dissenting).

[10] The majority fails to explain what "consequences" resulted from Giorgio's answer to the petition support question. Importantly, it is not explained what difference, if any, Giorgio's response had on the investigation.

is Commerce, not the ITC, that makes the industry support (standing) determination. Commerce provides information to the ITC after an affirmative industry support determination is made. *Id.* § 1673a(d). Second, the ITC producer questionnaire is typically issued after Commerce initiates its investigation. Once Commerce makes its industry support determination, it cannot be changed. 19 U.S.C. § 1673a(c)(4).

Thus, it is not the ITC's task to determine if a petition has requisite industry support; Congress assigned that task to Commerce. *Id.* § 1673a(c)(1)(A)(ii). Congress provided Commerce with its own tools for making that determination: the petition and, if necessary, a poll of the domestic producers. 19 U.S.C. § 1673a(c)(4)(D).

During Oral Argument, counsel for the ITC confirmed that Commerce determines industry support and that the ITC has no role in the determination.

<u>Court</u>:

> "As I understand it, there's a bright line rule for the initiation of these proceedings, which says there has to be 25 % support, correct? And that's not something the ITC administers . . . that's a bright line rule at Commerce . . . and it's based on the questionnaire"

<u>Counsel for the Commission interjects</u>:

> "No sir, it is not based on the questionnaire . . . that's where the confusion enters in. . . . It's Commerce's obligation under the statute to initiate the investigation. On the face of the petition there must be at least 25 % of in-

dustry support, the industry must
have supported that, or Commerce
will reject the petition."

Oral argument at 23:40–24:40 *available at http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2 013-1304.mp3.*

Court:

"So someone who checked oppose
or don't support isn't counted in
arriving at the 25 %?"

Counsel for the Commission responded:

"That is not part . . . they do their
exercise separately from what the
Commission does. The Commis-
sion sends out its questionnaires
after initiation."

Oral Argument at 24:44–25:00.

The above demonstrates that petition support expressions, in ITC questionnaire responses, do not further the enforcement of antidumping laws.

The majority solely relies on Commerce's Notice of Initiation issued in the underlying investigation for its assertion that statements of "explicit" support in an ITC questionnaire response impact Commerce's industry support determination. Maj. Op. at 13–14. There is, however, no showing precisely how Giorgio's ITC questionnaire impacted Commerce's initial industry support determination. The majority apparently believes that the Notice of Initiation evidences that Commerce considered Giorgio's preliminary questionnaire response, and specifically points to certain comments made to Commerce under 19 U.S.C. § 1673a(c)(4)(E), which permits interest-

ed parties to "submit comments or information on the issue of industry support."

The Notice states that Commerce received two "comments regarding industry support" on January 22, 1998. 63 Fed. Reg. 5361–62. The first was filed by a Chilean exporter asserting that the petitioners are not members of the applicable U.S. industry. *Id.* The second, an "expression of opposition," was filed by Giorgio with respect to the investigation (petition) involving imports from India. 63 Fed. Reg. 5362. The majority speculates that this "expression of opposition" has to be Giorgio's preliminary ITC questionnaire response. *See* Maj. Op. at 13–14.

Giorgio's comment was made pursuant to 19 U.S.C. § 1673a(c)(4)(E), which permits voluntary comments from interested parties concerning any aspect of an initiation, including industry support. It is unreasonable to conclude that Giorgio submitted its ITC questionnaire response for purposes of this comment period. Nor is there any evidence that Commerce consulted Giorgio's ITC questionnaire response for purposes of this comment period. Conversely, the Notice makes no mention of opposition by Giorgio in connection with the Chile, China, and Indonesia petitions. 63 Fed. Reg. 5362. Borrowing the majority's view, since the Notice states no opposition from Giorgio with respect to those investigations, one is forced to conclude that Giorgio supported those investigations. But this, too, would be speculation primarily because Commerce, by law, bases its industry support decision on the information provided in the petition. If the petition does not demonstrate the required industry support, the investigation is not initiated.

The majority concludes that Giorgio's "expression of opposition" and its preliminary ITC questionnaire response are the same document because they were filed on the same day. *See* Maj. Op. at 13–14. There are a number

of plausible reasons that could explain the coincidence, such as parallel due dates for receipt of factual submissions. Indeed, the Chilean comment was also filed on the same day. 63 Fed. Reg. 5361. This does not mean that the Chilean exporter filed its comments via an ITC questionnaire response. It did not.

The majority's second "consequence" is an impact on the ITC's material injury determination. Maj. Op. at 14–15. Specifically, the majority asserts that *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 984 (Fed. Cir. 1994) requires that the ITC, "in every case," take into account a producer's publicly stated position in its ITC questionnaire response for the purpose of making injury determinations. Maj. Op. at 14. This assertion is not correct, and it ignores the facts of the case. First, this Court noted the difference between a threat of injury case (where views of the industry must be considered) and a material injury case.[11] Thus, we held that "the breadth of relevant factors in *Trent Tube*, a material injury case, does not govern in this threat of material injury case." *Suramerica*, 44 F.3d at 984 (citing *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807 (Fed. Cir. 1992)). Here, the ITC case is not a threat of injury case so the relevant factors relied on in *Suramerica* have no application. One needs look no further than this case as an example where the answer to the ITC industry support question has no impact on the merits determination. Unlike *Suramerica*, there is no

---

[11]    For "material" injury cases, the ITC "may" consider factors beyond those listed in the statute. 19 U.S.C. § 1677(7)(B). In "threat" cases, the ITC "shall" consider all relevant economic factors, including publicly declared industry support. 19 U.S.C. § 1677(7)(F)(i). *See* also *Suramerica*, 44 F.3d at 984 (describing statutory differences for material and threat cases).

indication that the ITC relied on Giorgio's answers to the support question while there is significant evidence that the ITC relied on the trade data provided in the responses *to support* a finding of material injury in this case. In this regard, *Suramerica* supports Giorgio's assertion of a plausible claim.

Having acknowledged that *Suramerica* did not compel the ITC to consider publicly declared support, the majority instead asserts that the ITC *might* consider it. Maj. Op. 14, n. 7. This assertion does not salvage the petition support requirement's constitutionality. Under the commercial speech doctrine, a regulation "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 564. The Supreme Court has further explained that "[t]his burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).

It is irrelevant whether the ITC *might* consider publicly declared support because Giorgio has raised an as-applied, not facial, challenge. Appellant's Br. at 52. The question is not whether the ITC may, hypothetically, consider a producer's publicly declared support; it is whether the ITC considered Giorgio's support answers in this case. *Dahnke-Walker Milling Co. v. Bondurant,* 257 U.S. 282, 289 (1921) ("A statute may be invalid as applied to one state of facts and yet valid as applied to another."). The majority offers no evidence that the ITC considered Giorgio's support answer, or that the support answer otherwise alleviated any harm to a material degree.

In sum, the majority bases its reasoning on the assertion that the ITC questionnaire industry support question has "two types" of consequences that directly advance a

substantial government interest. Neither of these consequences is based in agency practice, agency regulations, or the trade statutes. Because neither Commerce nor the ITC rely on a producer's answer to the petition support question to respectively establish industry support under 19 U.S.C. §1673a(c)(4)(A), or otherwise to affect the outcome of a material injury case, the petition support requirement does not "directly advance" a substantial government interest.[12]   As such, the majority opinion renders the CDSOA petition support requirement unconstitutional under the First Amendment. *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 564.

The majority also supports its holding by comparing the CDSOA to the False Claims Act, arguing that payments and attorney's fees under the latter would not be available to a party like Giorgio who "sat on the sidelines and refused to take an open and active role in support of the government." Maj. Op. at 16 (citation omitted). Such reliance is misplaced because the *qui tam* provision of the False Claims Act rewards parties that *file an action*. 31 U.S.C. § 3730(d). The CDSOA does not require that only petitioners may receive a distribution.  Conversely, the eligibility of a *qui tam* plaintiff to qualify for proceeds does not hinge on a statement of "explicit support" for the action.

In any event, the facts in this case show that Giorgio did not sit on the sidelines but rather took significant action and played an important role towards the issuance of the antidumping order. Giorgio's second amended

---

[12]   Further, I have serious concerns regarding, but do not address, the constitutionality of the retroactive application of a statement of "explicit support" requirement to actions taken by U.S. producers two years prior to the enactment of the CDSOA.

complaint, which we accept as true at this stage, states that Giorgio supported the preparation of the petition. It contributed over one million dollars ($ 1,000,000) for legal fees towards preparation of the petition and participation in proceedings before Commerce and the ITC—an amount greater than contributed by any of the petitioners.[13] J.A. 74, ¶ 34. Prior to filing the petition, Giorgio provided the petitioner with confidential information regarding its capacity, production, sales, pricing, and profitability. J.A. 75, ¶ 37. The petition incorporated much of the information that Giorgio provided, e.g., Giorgio's closing of a production line for its largest can size due to the imports. J.A. 76, ¶ 41. After the petition was filed, Giorgio hosted two ITC staffers for a day-long field visit of the closed production line and reiterated its belief that the low-priced imports caused its closure. J.A. 77, ¶ 43. This type of "plant visit" is distinct from a verification visit under 19 C.F.R. § 353.36(c). A plant visit is conducted to educate Commerce and ITC personnel on production processes and overall relevant industry practices.

---

[13] Counsel for one of the petitioners appeared and argued that Giorgio's lack of support for the India petition undermined the petitions involving imports from other countries. Counsel's appearance and argument can best be understood in the context of CDSOA distributions. To the extent that Giorgio does not qualify for a distribution (at least $9 million), petitioners share of CDSOA money is significantly increased. This is an absurd result. Congress could not have contemplated a result where a U.S. producer submits a questionnaire response that details evidence of material injury and establishes in clear terms that it is a domestic producer of the like product that is adversely affected by virtue of dumped imports should not be entitled to a share of CDSOA money.

In sum, Giorgio establishes a plausible claim that it is an ADP. For these reasons, I dissent.