# United States Court of Appeals for the Federal Circuit

---

**PS CHEZ SIDNEY, L.L.C.,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES INTERNATIONAL TRADE COMMISSION,**
*Defendant-Appellant,*

**and**

**UNITED STATES CUSTOMS SERVICE,**
*Defendant-Appellant,*

**and**

**CRAWFISH PROCESSORS ALLIANCE,**
*Defendant-Appellant,*

**and**

**COMMISSIONER BOB ODOM
AND LOUISIANA DEPARTMENT OF
AGRICULTURE AND FORESTRY,**
*Defendants.*

---

2008-1526, -1527, -1534

---

Appeal from the United States Court of International Trade in case no. 02-00635, Judge Evan J. Wallach.

---

Decided: July 13, 2012

_____

MICHAEL T. SHOR, Arnold & Porter, LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief was WILLIAM E. BROWN, of Knoxville, Tennessee. Of counsel was ERUM Z. MIRZA, Arnold & Porter, LLP, of Washington, DC.

PATRICK V. GALLAGHER, JR., Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellant United States International Trade Commission. With him on the brief were JAMES M. LYONS, General Counsel, and NEAL J. REYNOLDS, Assistant General Counsel for Litigation.

FRANKLIN E. WHITE, JR., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant United States Customs and Border Protection. With him on the brief were TONY WEST, Assistant Attorney General, and JEANNE E. DAVIDSON, Director. Of counsel on the brief was ANDREW G. JONES, Office of Assistant Chief Counsel, United States Customs and Border Protection, of Washington, DC.

JOHN C. STEINBERGER, Adduci, Mastriani, & Schaumberg, L.L.P., of Washington, DC, argued for defendant-appellant Crawfish Processors Alliance. With him on the brief was WILL E. LEONARD.

_____

Before RADER, *Chief Judge*, NEWMAN and REYNA, *Circuit Judges.*

REYNA, *Circuit Judge.*

The now-repealed Continued Dumping and Subsidy Offset Act of 2000 (the "Byrd Amendment") allowed affected domestic producers ("ADPs") to receive distributions of antidumping duties collected by the United States. *See* Pub. L. No. 106-387, §§ 1001-1003, 114 Stat. 1549, 1549A-72 to -75 (codified at 19 U.S.C. § 1675c (2000)), *repealed by* Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601, 120 Stat. 4, 154 (Feb. 8, 2006) (effective Oct. 1, 2007). PS Chez Sidney, L.L.C. ("Chez Sidney") appeals the decision of the United States Court of International Trade affirming the determination of the United States International Trade Commission ("ITC") that it did not qualify as an ADP under the Byrd Amendment because its final questionnaire response indicated that it "t[ook] no position" regarding the underlying petition. *See PS Chez Sidney, L.L.C. v. Int'l Trade Comm'n* (*Chez I*), 442 F. Supp. 2d 1329, 1331-32 (Ct. Int'l Trade 2006). In addition, Chez Sidney appeals the affirmance of the decision of U.S. Customs and Border Protection ("Customs") that it was required to make distributions to Chez Sidney only to the extent that it could recover the funds from other ADPs. *See PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n* (*Chez III*), 558 F. Supp. 2d. 1370, 1373 (Ct. Int'l Trade 2008). Because we conclude that Chez Sidney is an ADP for the purpose of receiving Byrd Amendment distributions and that the Byrd Amendment imposes no conditions on the recovery of such funds, we reverse.

## I. BACKGROUND

This case arises out of Chez Sidney's attempt to obtain Byrd Amendment distributions under an antidumping duty order related to crawfish tail meat. The Byrd Amendment requires the ITC to send Customs an initial list of ADPs within 60 days after the issuance of an antidumping duty order. *See* § 1675c(d)(1). In order to be included on the list, a domestic producer must have been

either a petitioner or an "interested party in support of the petition." *Id.* § 1675c(b)(1)(A); *see also* 19 C.F.R. § 159.61(b)(1) (2012). Domestic producers can show support either "by letter or through questionnaire response." *See* § 1675c(b)(1)(A), (d)(1). Within 60 days of the end of each fiscal year, Customs makes distributions to the ADPs on this list that it determines have submitted timely certifications of qualifying expenditures. *See* § 1675c(d); 19 C.F.R. § 159.64; *see also* Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 77 Fed. Reg. 32,718, 32,751-52 (June 1, 2012) (announcing that Customs intends to distribute Byrd Amendment funds for fiscal year 2012, including funds related to the Crawfish Tail Meat/China order).

On September 20, 1996, the Crawfish Processors Alliance ("Alliance") filed a petition with the Department of Commerce ("Commerce") alleging dumping of crawfish tail meat from China.[1] The ITC issued questionnaires to domestic crawfish producers, including Chez Sidney, during the preliminary phase of the investigation. In its completed response, Chez Sidney indicated that it supported the petition by checking the box labeled "support." Although the record contains only two pages of the response, it is evident that missing portions of the response contained substantial information about the U.S. and Chez Sidney's crawfish production, as the ITC asks producers to supply detailed production, financial, and other information. After preliminarily determining that there was an indication of material injury to the domestic crawfish industry, the ITC sent final questionnaires to 47 firms identified as possible producers, including Chez Sidney. In its response to the final questionnaire, Chez

---

[1] Chez Sidney was neither a member of the Crawfish Processors Alliance nor a named petitioner.

Sidney checked the "take no position" box on whether it supported the petition and also indicated that it had completed the questionnaire. The record contains no indication that Chez Sidney participated in the investigation in any other way, that it took any action indicating that it did not support the petition, or that it in any way opposed the potential imposition of antidumping duties on imports of crawfish tail meat from China. The ITC subsequently issued an affirmative final determination that the crawfish tail meat industry in the United States had been materially injured by virtue of imports of crawfish tail meat that had been sold in the United States at less than fair value. Crawfish Tail Meat from China Determination, 62 Fed. Reg. 49,255 (Sept. 19, 1997). On September 15, 1997, the Department of Commerce issued an antidumping duty order. Notice of Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed. Reg. 48,218, 42,219 (Sept. 15, 1997).

In October 2000, Congress enacted the Byrd Amendment. Pursuant to § 1675c(d)(1), the ITC provided Customs with a list of eligible ADPs for each antidumping duty order then in effect. The list identified the Alliance as a group of domestic crawfish tail meat producers but did not list individual members. Nor is it clear from the record which of the individual members filed questionnaire responses or otherwise checked boxes indicating support of the petition. The Alliance sent a letter to Customs identifying the members who sought to be added to the list, and Customs added most of the members to the list on June 20, 2002. Customs declined to add six members who had neither submitted letters nor responded to the questionnaires.

In August 2002, Chez Sidney requested that the ITC add it as an ADP and submitted to Customs its certification for a distribution under the Byrd Amendment. The ITC denied Chez Sidney's request because Chez Sidney's response to the final questionnaire "d[id] not indicate support for the petition." J.A. 93. Chez Sidney requested reconsideration, arguing that the statement of support on its preliminary response was sufficient. The ITC again denied the request, stating:

> The Commission has reconsidered your request to add PS Chez Sidney, LLC to the list of petitioners and other entities supporting petitions in the subject investigation and again finds that it is inappropriate to do so. Chez Sidney provided conflicting statements on its position with respect to the petition by indicating support for the petition in the preliminary phase of the investigation but changing its position to expressly "take no position" in the final phase of the investigation. Further, as the latter is the latest expressed position during the original investigation, under these circumstances the Commission does not find it to be appropriate to add Chez Sidney Seafood, Inc. (the company's name at the time) to the list.

J.A. 98. Customs likewise denied Chez Sidney's request for a Byrd Amendment distribution because the ITC had not added Chez Sidney to the list of eligible ADPs.

On October 2, 2002, pursuant to 28 U.S.C. § 1581(i), Chez Sidney filed a complaint with the Court of International Trade challenging the ITC's determination that Chez Sidney had not supported the petition. *Chez I*, 442

F. Supp. 2d at 1335. Chez Sidney immediately moved to enjoin Customs from making distributions to eligible parties, but its motion was denied.

Chez Sidney also moved for summary judgment on the grounds that the "support" requirement of the Byrd Amendment violated the First Amendment or, in the alternative, that the ITC had misinterpreted the Byrd Amendment when it found that Chez Sidney had failed to satisfy the support requirement. *See id.* at 1337-38. The Court of International Trade granted the motion, concluding that the Byrd Amendment violated the First Amendment. *Id.* at 1359-60. It declined to resolve the statutory argument, stating that it would not substitute its judgment for the ITC's regarding "the factual question of whether Chez Sidney indicated support for the subject petition." *Id.* at 1332. The court certified the issue for immediate review and reserved the questions of severability and damages. *Id.* at 1359.

In July 2007, the Court of International Trade addressed the issues of severability and damages. *PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n (Chez II)*, 502 F. Supp. 2d 1318, 1320 (Ct. Int'l Trade 2007). It determined that the unconstitutional sections of the Byrd Amendment were severable, *id.* at 1323, and struck the support requirement from the definition of an ADP in § 1675c(b)(1)(A) and from the description of the list of ADPs in § 1675c(d)(1), *id.* at 1324. It then remanded the matter to the ITC for a determination of whether, under the new definition, Chez Sidney qualified to be on the list of ADPs and, if so, to Customs for a determination of the sufficiency of Chez Sidney's claims. *Id.* at 1324-25. It instructed Customs to determine "how Chez Sidney [would] receive its pro rata share, if any," of the distributions. *Id.* at 1325.

On remand, the ITC determined that Chez Sidney qualified for inclusion on the list of ADPs.[2] *Chez III*, 558 F. Supp. 2d. at 1373. Customs found that Chez Sidney was eligible for distributions for fiscal years 2002 and 2003, but that this eligibility was conditional, applying only "to the extent these funds are either recoverable from the affected domestic producers who initially received them or are available in the Special Account." *Id.* at 1373-74.

Chez Sidney again appealed to the Court of International Trade, challenging Customs' remand determination on three grounds: (1) that the proposed remedy was inadequate; (2) that Chez Sidney was entitled to pre- and post-adjustment interest on its *pro rata* shares; and (3) that Chez Sidney was entitled to post-2003 fiscal year Byrd Amendment distributions. The Court of International Trade affirmed, explaining that "Customs' decision to . . . follow its internal administrative process to secure the funds with which to [pay Chez Sidney] is neither inconsistent with the court's remand instructions nor arbitrary and capricious." *Id.* at 1375.

---

[2] The procedural history of this case is long and complex. A more complete account of the history of this case can be found in the three Court of International Trade opinions. We have included only those aspects necessary to our analysis. Here, the ITC's second determination—that Chez Sidney *was* an ADP—was implicitly reversed by our order of October 28, 2010 summarily reversing the Court of International Trade's judgment with regard to the constitutional issues and ordering Chez Sidney to submit the first brief. The parties have therefore framed the issue as an appeal from the ITC's original determination that Chez Sidney was *not* an ADP, and this is the perspective from which we view the matter in writing this opinion.

The ITC, Customs, and the Alliance appealed to this court, and Chez Sidney cross-appealed. We stayed the appeals and cross-appeals pending a final decision in *SKF USA, Inc. v. U.S. Customs & Border Protection*, 556 F.3d 1337, 1340, 1358-60 (Fed. Cir. 2009) (holding that the Byrd Amendment's support requirement was constitutional under both the First Amendment and the Equal Protection Clause). After the Supreme Court denied certiorari in *SKF*, *see SKF USA, Inc. v. U.S. Customs & Border Protection*, 130 S. Ct. 3273 (2010), we granted Chez Sidney's motion to lift the stay in this case. In accordance with *SKF*, we reversed the Court of International Trade's judgment with respect to the constitutional issues and dismissed Chez Sidney's cross-appeal.[3] *PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, 409 F. App'x 327, 329 (Fed. Cir. 2010). With respect to the statutory issues, we ordered Chez Sidney to submit the first brief as appellee. This court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## II. DISCUSSION

### A.

When reviewing a Court of International Trade decision in an action initiated under 28 U.S.C. § 1581(i), this court applies the standard of review set forth in 5 U.S.C. § 706. *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1004 (Fed. Cir. 2003). Accordingly, we review questions of law, including the interpretation of statutory provisions, to determine whether agency actions or conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

---

[3] This opinion does not address the constitutionality of the Byrd Amendment, which was decided in *SKF*. 556 F.3d at 1360.

We review questions of fact to determine if they are "unsupported by substantial evidence." *Id.* § 706(2)(E).

## B.

We must examine whether Chez Sidney was an eligible ADP given that it filed preliminary and final questionnaire responses, indicating in its preliminary questionnaire response that it supported the petition but stating that it took no position in its final questionnaire response. Although the Court of International Trade treated the ITC's determination of Chez Sidney's ADP status as a question of fact, the issue before us—whether the ITC's determination was based on a proper interpretation of the Byrd Amendment—is a question of law which we review de novo. *Cf. Bayer AG v. Schein Pharm., Inc.*, 301 F.3d 1306, 1312 (Fed. Cir. 2002). In light of *SKF*, we conclude that the ITC's original determination that Chez Sidney was not an ADP was contrary to law.

In our review of the ITC's interpretation of the Byrd Amendment, we are guided by the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 596 F.3d 1365, 1368 (Fed. Cir. 2010). The *Chevron* analysis has two steps. First, we must determine if there is an ambiguity in the statute such that an agency has room to interpret. If so, then we must determine whether the agency's action is a reasonable interpretation of Congress's intent. *Chevron*, 467 U.S. at 842-43.

We begin with the question of whether the language of § 1675c(d) is reasonably susceptible to only one interpretation. Section 1675c(d) requires the ITC to forward to Customs "a list of persons that indicate support of the petition by letter or through questionnaire response." By its terms, the statute clearly defines " supporters" as

persons who either submitted letters or responded to questionnaires. Both the ITC and Customs, however, contend that § 1675c(d) requires not just the submission of letters or responses, but also the inclusion of an affirmative declaration of support for the petition. But the statute's plain language does not require that producers indicate an expression of support other than through a letter or by filing a response—it states that supporting producers are those who submit letters or responses.

In this case, Chez Sidney submitted its response as a U.S. producer of crawfish tail meat in the preliminary stage of the investigation. Its response provided information sought by the ITC for use in making critical determinations, including standing and "like-product" determinations. Information provided by Chez Sidney was used along with other domestic producer information, such as that of the Alliance, to prepare the ITC staff report and the ITC's preliminary injury determination. In addition, Chez Sidney filed a response in the final phase of the investigation, providing information used by the ITC as a basis for its final injury determination. Such participation by domestic producers is essential to allow the ITC to successfully complete its investigations.

To the extent that any ambiguity existed in § 1675c(d), it was resolved by the limiting construction of the Byrd Amendment adopted by this court in *SKF*. In *SKF*, the Court of International Trade held that the support requirement of § 1675c(b)(1)(A) of the Byrd Amendment violated the Equal Protection Clause. *See SKF*, 556 F.3d at 1346. It also held that the support requirement was severable, effectively redefining ADPs from "interested parties in support of a petition" to "interested parties in a petition." *See id.* This potentially allowed SKF, which had responded to questionnaires but also had actively opposed the petition, to qualify for over

$1.4 million in Byrd Amendment distributions. *See id.* at 1346-47.

On appeal, this court focused on SKF's contention that "the Byrd Amendment violate[d] the First Amendment because 'a manufacturer who opposes an investigation is penalized . . . for expressing its views on the matter.'" *Id.* at 1351. We noted that "if this were the purpose of the Byrd Amendment, it might well render the statute unconstitutional." *Id.* To avoid this result, we concluded that the Byrd Amendment's purpose was not to prohibit opposing views but "to reward injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings." *Id.* at 1352, 1353 n.25. This purpose had the additional benefit of furthering the statute's stated goals of strengthening the remedial purpose of the law by deterring continued dumping after the issuance of antidumping orders. *See id.*

Under this reading, it was necessary to limit the meaning of the term "support" so that it would not include the mere abstract expression of support. This raised the question of whether SKF, which had expressed its opposition to the petition, was nevertheless a supporter because it assisted the ITC's investigation by responding to questionnaires. We acknowledged that "those supporting a petition by completing a questionnaire may supply less assistance than petitioners." *Id.* at 1358. However, focusing on the purpose of the statute to reward assistance to the government, we noted that "ITC questionnaires . . . are extremely detailed," and that "the costs of responding to such questionnaires are substantial." *Id.* Thus, in *SKF*, we "agree[d] with the Court of International Trade to the extent that it construed the Byrd Amendment to permit distributions to those who 'participated'," noting that "[e]ach of the supporters in this case responded to an

ITC questionnaire and thus participated actively in the proceeding." *Id.* at 1353 n.26. On the other hand, "a party that did no more than submit a bare statement that it was a supporter without answering questionnaires or otherwise actively participating would not receive distributions." *Id.* at 1353 n.26. By concentrating on the activities of supporters, we were able to "cabin [the support requirement's] scope so that it [did] not reward a mere abstract expression of support." *Id.* at 1353. However, SKF's other actions in opposition to the petition outweighed the assistance it provided by responding to the questionnaire. *See id.* at 1359.

Both the ITC and Customs contend that under *SKF*, a neutral party cannot be considered a supporter of a petition:

> At best the role of parties opposing (or not supporting) the petition in responding to questionnaires is similar to the role of opposing or neutral parties in litigation who must reluctantly respond to interrogatories or other discovery. There is no suggestion that such parties must be favored by an award of attorney's fees or other compensation similar to that given to prevailing plaintiffs who successfully enforce government policy. It was thus rational for Congress to conclude that those who did not support the petition should not be rewarded.

*Id.* We are not persuaded. *SKF* did not address the proper result when, as here, a producer actively supports a petition by responding to questionnaires but, by checking a box, expresses in one of its responses that it supports the petition but in the other that it takes no

position.    We conclude that in this circumstance, the producer qualifies as a supporter.  In *SKF*, we noted that while a bare *statement* of support was insufficient, such a statement would be enough when combined with the *activity* of responding to questionnaires.  *Id.* at 1353 n.26. Because we have construed the Byrd Amendment not to reward or penalize abstract expression by itself, the same result would necessarily obtain here, where the producer submitted two detailed responses, checking the "support" box in its preliminary response but checking the "take no position" box in its final response.  There is no indication that Chez Sidney undertook any activity to oppose the petition or investigation, including checking the "oppose" box in either of the questionnaire responses.

The legislative history of the Byrd Amendment supports an inclusive determination of ADPs.  As we observed in *SKF*,

> Congressional findings supporting the Byrd Amendment state that "United States unfair trade laws have as their purpose the restoration of conditions of fair trade" and that "injurious dumping is to be condemned."   Pub. L. No. 106-387, § 1002, 114 Stat. at 1549A-72; *see also* 146 Cong. Rec. 23,117 (2000) (statement of Sen. Byrd) (describing the Byrd Amendment as necessary to "deter unfair trade practices").  These findings also state that "continued dumping . . . after the issuance of antidumping orders . . . can frustrate the remedial purpose of the laws" to the detriment of "domestic producers . . . small businesses and American farmers and ranchers" and that the "United States trade laws should be strengthened to see

> that the remedial purpose of those laws is
> achieved." Pub. L. No. 106-387, § 1002,
> 114 Stat. at 1549A-72-73.

*Id.* at 1352. We agree with the Court of International Trade that the Byrd Amendment's legislative history generally "expresses Congressional intent to assist domestic U.S. industries injured by foreign dumping and subsidization." *Chez I*, 442 F. Supp. 2d at 1338. Here, Chez Sidney is a U.S. producer of a like product under investigation and as such formed part of the U.S. industry found to be materially injured by import of dumped crawfish tail meat. There is no language within the legislative history to imply that the ITC should minimize the number of such domestic producers on its list. Rather, Congress emphasized the need to assist domestic producers. An inclusive reading of the Byrd Amendment furthers that goal.

We hold that when a U.S. producer assists investigation by responding to questionnaires but takes no other action probative of support or opposition, the producer has supported the petition under § 1675c(d) and is eligible for distributions if it can otherwise make the required certification that it has been injured. In light of our holding in *SKF*, we find the statute to be unambiguous. Accordingly, we do not reach the issue of whether deference is owed to the agency's interpretation of the statute under *Chevron*. *See Chevron*, 467 U.S. at 842.

We reject as unreasonable the ITC's interpretation of the "support" term in § 1675c(d) to mean the last indicated expression of support. For example, a producer's expression of support in the response to the preliminary questionnaire is critical to the determination of whether to commence an investigation of an antidumping petition. *See* 19 U.S.C. § 1673a(c)(1)(A), (c)(4)(A) (allowing an

investigation to go forward only upon a showing that a sufficient percentage of producers express support for the petition); *SKF*, 556 F.3d at 1362-63 (Linn, J., dissenting) (explaining concisely how the preliminary determination works). For this reason, the ITC's bald assertion that a final expression of "take no position" is sufficient to deny ADP status to Chez Sidney is unreasonable.

With the foregoing in mind, we turn to the ITC's determination that Chez Sidney did not support the petition. The ITC based its denial of Chez Sidney's request to be added to the list of ADPs on the fact that Chez Sidney's "latest expressed position" was not in support of the petition. J.A. 98. It is evident that the ITC considered only the boxes Chez Sidney had checked in making its decision. As our discussion above illustrates, however, such an approach is unreasonable.

When asked what would have happened if Chez Sidney had not checked any box on the final questionnaire, the ITC stated that Chez Sidney's status as an ADP would "depend on the surrounding circumstances." Oral Argument at 18:45. This is correct because it is the surrounding circumstances, not abstract statements of support alone, upon which an appropriate support determination depends. One such important circumstance is whether the producer has participated in the investigation by providing supporting information or arguments in a questionnaire response. Here, Chez Sidney provided sales, production, and other data to the ITC in both phases of the investigation. It also expressed abstract support in the preliminary response and took no position in its final response. Significantly, Chez Sidney did not fail to file responses to the questionnaires, it did not engage in activity in opposition to the petition, and it never expressed that it opposed the petition. Under these

circumstances, Chez Sidney was an ADP within the meaning of the Byrd Amendment.

C.

We turn next to the question of damages. Chez Sidney originally requested an injunction to prohibit Customs from distributing payments pending resolution of its case. *See Chez I*, 442 F. Supp. 2d at 1335. The injunction was denied, the funds were distributed, and Chez Sidney amended its complaint to request money damages.

As a preliminary matter, we must address an issue arising out of the somewhat unusual procedural posture of this case. After *SKF* was decided, we summarily reversed the Court of International Trade with respect to the constitutional issues in this case but allowed the parties to brief the non-constitutional issues. *See PS Chez Sidney, L.L.C.*, 409 F. App'x at 329. The issue of damages does not involve a constitutional question and was originally addressed in Chez Sidney's cross-appeal. Our order dismissed the cross-appeal, and we deemed it appropriate to reverse the order of the briefs, effectively placing Chez Sidney in the role of an appellant despite its status as an appellee. *See id.* Customs now argues that Chez Sidney cannot raise the issue of money damages because doing so would enlarge its rights as an appellee without having a cross-appeal before this court. *See Bailey v. Dart Container Corp. of Mich.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002). Under these circumstances, we do not believe that Chez Sidney's status as an appellee should preclude it from arguing for increased money damages.

Here, the question of entitlement to money damages is not focused on whether Chez Sidney should be awarded such damages, but on whether Customs' conditional award of damages was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706. Customs determined that Chez Sidney could only recover the distributions to which it was entitled "to the extent these funds are either recoverable from the [ADPs] who initially received them or are available in the Special Account." *Chez III*, 558 F. Supp. 2d at 1374; *see also* Notice of Filing of Remand Decision, *PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, No. 02-00635 (Ct. Int'l Trade Feb. 5, 2008), ECF No. 131. It stated that this determination was in accordance with 19 C.F.R. § 159.64(b)(3). *Chez III*, 558 F. Supp. 2d at 1375. The Court of International Trade concluded that Customs had not abused its discretion by following its published regulations. *Id.*

However, the cited regulation applies not to an ADP's recovery of funds from Customs, but to Customs' recovery of funds from ADPs. To be sure, 19 C.F.R. § 159.64(b)(3) will govern how Customs recovers the overpayments it made to other ADPs in this case. But it does not limit an ADP's entitlement to distributions to only those situations in which Customs can recover funds previously paid. The Byrd Amendment states that Customs "shall distribute all funds" to eligible ADPs. *See* § 1675c(d)(3). Here, this may be as simple as directing the ITC to release funds from the special account, which it stated at oral argument has typically contained more than adequate funds in the past. Oral Argument at 26:47-28:45. It may require the Court of International Trade to exercise its power to award a money judgment. *See* 28 U.S.C. § 2643(a)(1) (2006); *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1312 (Fed. Cir. 2004) ("[T]he Court of International Trade's relief statute provides for entry of a money judgment for or against the United States in any civil action commenced under section 1581 . . . ." (internal quotation marks omitted)).

Chez Sidney should not be treated as a second-class ADP; it should be treated in the same manner as any other ADP eligible to receive Byrd Amendment distributions. We therefore vacate that portion of the judgment establishing the mechanism by which Chez Sidney would receive its funds. On remand, the Court of International Trade should fashion a remedy that ensures Chez Sidney will receive the money to which it is entitled, along with such interest as may be provided in accordance with law.

### III. CONCLUSION

For the foregoing reasons, the decision of the Court of International Trade is hereby

**REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED**

### COSTS

Each party shall bear its own costs.