REYNA, Circuit Judge,
dissenting.
Appellant appeals the decision of the Court of International Trade that found it ineligible to qualify for a distribution share under the Continued Dumping and Subsidy Offset Act. The majority affirms the trial court while I conclude that Appellant has established a plausible claim that it is an affected domestic producer eligible to receive such a distribution. The majority’s approach evidences a fundamental misunderstanding concerning initiation of anti-dumping investigations and improperly rewrites the statute to reach an outcome that is contrary to the Congressional purpose of the Continued Dumping and Subsidy Offset Act, the precedent of this court, and the freedoms of expression guaranteed under the First Amendment.
The trial court dismissed Appellant’s statutory and First Amendment claims for failure to state a claim pursuant to Rule 12 of the Rules of the Court of International Trade. At this stage, Giorgio is only required to allege sufficient facts to establish a plausible claim that it is an ADP under the CDSOA. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A significant problem is that the majority consistently seeks to address the merits of the case, ie., whether Giorgio is entitled to disbursements, not whether Giorgio makes a plausible claim for relief. As I describe below, I conclude that Giorgio has established a plausible claim for relief, not that Giorgio is necessarily entitled to disbursements. For these reasons, I respectfully dissent.
I. Indicating Industry Support
Congress enacted the Continued Dumping and Subsidy Offset Act[1] (“CDSOA” or the “Byrd Amendment”) to ameliorate the injurious effects of dumping and illegal subsidies by distributing portions of collected antidumping and countervailing duties to U.S. producers of the affected industry. See Pub.L. No. 106-387, § 1002. To be sure, Congress intended that the remedial effect of CDSOA distributions would be distinct from the remedial trade relief afforded under U.S. trade laws.[2] The former provides company-specific relief by assisting U.S. producers affected by dumping to rebuild, while the latter provides relief to the affected industry as a whole by raising the price of imports found to have been dumped.
Specifically, the CDSOA provides that “[djuties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures.” 19 U.S.C. § 1675c(a). The statute is clear on its face that to receive distributions, a producer must first be an “affected domestic producer” and must certify that it desires to receive distribu *605 tions, that it has not previously requested distributions for the qualifying expenditures it now seeks, and that it is eligible to receive distributions as an “affected domestic producer.” 19 U.S.C. § 1675e(d)(2). This case, like its predecessors, focuses on the interpretation of “affected domestic producer” (ADP). The precise question on appeal is whether Giorgio has established a plausible claim that it is an ADP under the CDSOA.
To qualify as an ADP, a producer must have been a “petitioner or interested party in support of the petition.” 19 U.S.C. § 1675c(b)(l)(A). The CDSOA directs the United States International Trade Commission (“ITC” or “Commission”) to forward to U.S. Customs and Border Protection (“Customs”) a list of ADPs. 19 U.S.C. § 1675c(d)(l). Customs then distributes the collected antidumping duties to listed ADPs who have provided the requisite certifications. 19 U.S.C. § 1675c(d)(3). For non-petitioners to be on this list, the CDSOA requires that the producer be an interested party and “indicate support of the petition” by letter or, as is relevant here, “through questionnaire response.” 19 U.S.C. § 1675c(d)(l).
The generality of this provision is notable; Congress only required that an interested party “indicate” support.[3] During an antidumping investigation, both the ITC and the Department of Commerce (“Commerce”) send questionnaires to domestic producers at the preliminary and final stages of their respective investigations. The CDSOA does not specify which agency’s questionnaire responses must include the indication of support. Nor does it specify whether the questionnaire is the preliminary questionnaire or the final questionnaire. Most important, the CDSOA does not specify how a producer must indicate support — it only requires that the producer “indicate” support through the questionnaire response.[4]
For decades, the ITC’s questionnaires have contained a petition support question that asks “Do you support or oppose the petition? Please explain.” See J.A. 152, 189 (Giorgio’s ITC questionnaire responses). The questionnaire provides boxes next to “Support,” “Oppose,” or “Take no position,” as well as three lines where a producer can provide statement(s). To provide an example, I set out below the petition support question from Giorgio’s response to the preliminary questionnaire.[5]
*606 [[Image here]]
In passing the CDSOA, Congress did not refer to the ITC questionnaire, much less the ITC support boxes. Nor did Congress provide any guidance, for example, as to what happens if a U.S. producer checks the take no position box and then writes “please issue an antidumping order.” This is important because the majority opinion focuses on whether a box was checked or not. It is clear, however, that Congress could not have intended that the petition support requirement would hinge one way or another on the boxes. The ITC has used generally the same questionnaires at least as far back as the 1980s, well before the passage of the CDSOA in 2000. SKF USA Inc. v. U.S. Customs & Border Prot., 556 F.3d 1337, 1357-58 (Fed.Cir.2009). Stated differently, the support boxes existed over 15 years before the passage of the CDSOA. The boxes were not created for or by the CDSOA, nor did Congress designate the boxes as the place for indication of support of a petition. Indeed, the boxes are but a small, insignificant part of what is otherwise a questionnaire that calls for highly technical, complex, company-specific data that is often business proprietary information, as well as general industry, publically-available trade data and private market research data.
On the other hand, the boxes alone provide no meaningful data or measurement towards a finding of material injury, the goal of any worthy antidumping petition. Had Congress wanted to make the ITC petition support question determinative of support for CDSOA purposes, it would have explicitly done so. But it did not. There is no indication in the statute or the legislative history that Congress intended that checking a box would determine whether one was an ADP.
It is unjust to penalize a U.S. producer like Giorgio who submitted its questionnaire response two years before the CDSOA was enacted and had no clue that its answer to that one question would cost it CDSOA distributions.[6] Congress could not have' intended such a result.[7] Yet, that is the result mandated by the majority.
*607 II. Rewriting the Statute
The majority holds that to meet the support -requirement, a producer’s ITC questionnaire responses must include a statement of “explicit” support. Maj. Op. at p. 601. The majority is careful not to hinge support on whether a specific box is checked or to explain what constitutes a statement of explicit support. The explicit support rule instead suggests^ that statements of explicit support may be found somewhere in the ITC questionnaire responses.
I respectfully dissent from my colleagues’ rewriting of the statute to require a statement of “explicit” support. The statute does not contain such a requirement, just as the statute does not mandate that a specific box be checked. To the contrary, the plain language of the statute on its face requires the producer to “indicate” support through questionnaire response. The Supreme Court has repeatedly cautioned against departing from the plain language of a statute. Schindler Elevator Carp. v. U.S. ex rel. Kirk, — U.S. -, 131 S.Ct. 1885, 1891, 179 L.Ed.2d 825 (2011); Tennessee Valley Auth. v. Hill, 437 U.S. 153, 193-94, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Under the majority opinion, the legal issue of whether a U.S. producer has' indicated support through a questionnaire turns on whether a statement of support is “explicit.” This new rule is nowhere in the statute.
III. Evidence Indicating Support
The question here is whether Giorgio indicates support for the petition through its questionnaire response(s). The answer is yes. As this Court noted in PS Chez Sidney, whether a questionnaire response indicates support is determined by the substance of the response as a whole, i.e., through the questionnaire. PS Chez Sidney, L.L.C. v. U.S. Int’l Trade Comm’n, 684 F.3d 1374, 1379, 1382-83 (Fed.Cir. 2012).
Giorgio’s questionnaire responses provide data and argument that supports a finding of material injury, or threat thereof, which leads to the issuance of an anti-dumping duty order. Giorgio submitted detailed, company-specific financial data concretely showing the decreasing value of its shipments, decreased wages, increased inventories, and decreased net income and profits. J.A. 155, 162, 165-66, 194, 200, 204-06. Giorgio explained that its net sales decreased from about $74.9 million in fiscal year (FY) 1995 to about $48 million in FY 1997, a decrease of $26.9 million or about thirty-six percent (36%). J.A. 162, 200. During this time, its total cost of goods sold fell from about $60.5 million to about $40 million and gross profits shrunk from about $14.4 million to about $8 million, or a loss of about forty-four percent (44 %). j.A. 162, 200. These are precisely the type of data that prove material injury during an investigation.
The majority dismisses these data as being merely “factual statements,” and not statements that indicate support for the petition. Maj. Op. at pp. 601-02. Howev- . er, there is no reason why empirical data, factual information, and legal argument cannot indicate support. This remarkable position defies a fundamental tenet of U.S. law that recognizes that facts speak louder than words. Cf. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868, (2009) citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 *608 L.Ed.2d 929 (2007). In trade law, the game is in the data. Factual statements corroborated by data are evidence that carry determinative weight. One could even say that the data in a pro-ducer’s questionnaire responses speaks so loud, one cannot hear what the producer is saying.
The majority is incorrect that Giorgio’s questionnaire response does not indicate support. Indeed, Giorgio’s questionnaire response can reasonably and fairly be said to constitute, in its -entirety, a statement of “explicit support” for the petition. Giorgio states that the investigated imports “diminish or extinguish our ability to remain in business.” J.A. 164, 202. Giorgio was. forced to discontinue a product line and decrease production at numerous facilities because of the “extremely low” and “prevailing depressed” prices caused by the subject imports, thereby forcing Giorgio to “layoff numerous employees.” J.A. 154, 191. These layoffs were needed in light of the “depressed times in the domestic preserved mushroom industry” caused by the dumped imports. J.A. 154, 191. Even after layoffs, “if the downward trend [in net sales] continues or does not show any improvement Giorgio Foods, Inc. could be forced to close its operations.” J.A. 154, 191.
These are explicit statements of material injury and demonstrate open, explicit support of the petition by a domestic producer of the like product. When one considers that the statements were made two years prior to the enactment of the CDSOA, logic dictates that these substantive statements constitute a plausible indication of support. That the majority turns a blind eye to these explicit statements shows that it focused exclusively on the petition support question boxes. The majority’s approach, relying on abstract expressions of support, is contrary to our precedent.
IV. Ignoring Precedent
Our precedent emphasizes an inclusive reading of the petition support requirement that assesses support based on actions, not specific words. In SKF, we considered a First Amendment constitutional challenge to the CDSOA’s support requirement. SKF USA, Inc. v. U.S. Customs & Border Protection, 556 F.3d 1337 (Fed.Cir.2009). We recognized that a statute is likely unconstitutional if its purpose 'is to penalize viewpoint expression. As a result, we held that the CDSOA rewards actions in support of litigation, not “abstract expression of support”- — -essentially focusing on the substance of the producer’s responses, not their form. Id. at 1353. Thus, the Court in SKF sidestepped the constitutional issues concerning requiring viewpoint expression by focusing on action in support of litigation. SKF, 556 F.3d at 1353. Yet, in this case, the majority sidesteps “action in support of litigation,” and instead imposes a viewpoint-based expression of support requirement.
The majority’s opinion prizes form over substance; it prefers nonfactual (i.e., abstract) expressions of support over actions that support litigation. Whether to label a statement as explicit support or as a statement that indicates support is immaterial where both depend entirely on the abstract form of the expression. Here, the majority determines that action that supports litigation is not an explicit statement of support. As a result, the SKF case and the majority opinion are in direct conflict and irreconcilable.
Today’s “statement of explicit support” holding also contravenes this Court’s holding in PS Chez Sidney. In PS Chez Sidney, we held that a producer may qualify as an ADP even though it answered “Take no position” to the petition support question in its final ITC questionnaire re *609 sponse. PS Chez Sidney, L.L.C. v. U.S. Int’l Trade Comm’n, 684 F.3d 1374, 1379, 1383 (Fed.Cir.2012). To ensure that the CDSOA furthered its goal of “assist[ing] domestic producers,” we stressed an “inclusive reading” of the statute. Id. at 1382. We explained in PS Chez Sidney that “it is the surrounding circumstances, not abstract statements of support alone, upon which an appropriate support determination depends.” Id. at 1382-83. Here, the majority ignores the significant evidence of Giorgio’s actions that supported the petition and instead seeks out explicit statements of support.[8] As a result, the majority opinion is in direct and irreconcilable conflict with this Court’s decision in PS Chez Sidney.
In Ashley Furniture, we considered statutory and constitutional challenges by two domestic producers, Ashley and Ethan Allen, which answered the petition support question “Take no position” and “Oppose,” respectively. Ashley Furniture Indus., Inc. v. United States, 734 F.3d 1306, 1308 (Fed.Cir.2013), cert. denied, — U.S.-, 135 S.Ct. 72, 190 L.Ed.2d 35 (2014). Upon noting that the producer in PS Chez Sidney checked the support box in its preliminary questionnaire response (but not in the final questionnaire), this Court in Ashley Furniture held that a producer who “never indicates support for the petition by letter or through questionnaire response cannot be an ADP.” Id. at 1311-12 (internal citations omitted).
The majority bases much of its holding on Ashley Furniture, concluding that it “foreclose[es]” Giorgio’s arguments. Maj. Op. 601. Ashley Furniture, however, presented wholly different facts than those of this case. Notably, there was no showing in Ashley Furniture of actions taken in support of the petition. Nor did the Court provide any analysis of Ashley’s and Ethan Allen’s questionnaire responses beyond the petition support question. Instead, Ashley Furniture, concluded that the questionnaire response must at least include “a bare statement” of support. Ashley Furniture, 734 F.3d at 1311. Here, the majority alters the “bare statement of support” requirement to achieve statement of “explicit support,” thereby rendering the holding in this case inconsistent with Ashley Furniture.
In sum, the explicit support rule is contrary to our precedent, and, as I describe below, renders the CDSOA unconstitutional. These constitutional concerns bolster my conclusion that the majority’s interpretation of the CDSOA is incorrect. Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (“where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.”) (internal citations omitted).
V. Constitutionality of the CDSOA
In SKF, we held that the constitutionality of the CDSOA’s petition support requirement under the First Amendment is assessed under the commercial speech doctrine. SKF, 556 F.3d at 1355.[9] Under *610 this doctrine, the regulation must “directly advance! ]” a substantial government interest. Id. (citing Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). In SKF, we held that the petition support requirement directly advances the government interest in preventing dumping by rewarding parties who assist in antidumping enforcement. SKF, 556 F.3d at 1355. To avoid the constitutional challenge, the Court in SKF focused on whether a party “assists,” or takes action in support of the petition, not whether a party “expresses support” for the petition. See SKF, 556 F.3d at 1353.
Giorgio argues that this case presents a related, but different constitutional question: whether it is constitutional to determine petition support entirely on the presence of a statement of explicit support. See Appellant’s Br. 57. The majority rejects this challenge on the basis that a statement of explicit support “has consequences” that are of “two types” that furthers the Government’s interest in enforcing the antidumping laws. Maj. Op. at 602. First, it influences Commerce’s decision as to whether the petition has the requisite industry support. Id. Second, it influences the ITC’s material injury determination. Id. These assertions reflect a fundamental misunderstanding on how antidumping investigations are conducted.
The ITC questionnaire response does not affect whether Commerce initiates an investigation.[10] First, it is Commerce, not the ITC, that makes the industry support (standing) determination. Commerce provides information to the ITC after an affirmative industry support determination is made. ■ Id. § 1673a(d). Second, the ITC producer questionnaire is typically issued after Commerce initiates its investigation. Once Commerce makes its industry support determination, it cannot be changed. 19 U.S.C. § 1673a(c)(4).
Thus, it is not the ITC’s task to determine if a petition has requisite industry support; Congress assigned that task to Commerce. Id. § 1673a(c)(l)(A)(ii). Congress provided Commerce with its own tools for making that determination: the petition and, if neeessai~y, a poll of the domestic producers. 19 U.S.C. § 1673a(c)(4)(D).
During Oral Argument, counsel for the ITC confirmed that Commerce determines industry support and that the ITC has no role in the determination.

Court:

“As I understand it, there’s a bright line rule for the initiation of these proceedings, which says there has to be 25 % support, correct? And that’s not something the ITC administers ... that’s a bright line rule at Commerce ... and it’s based on the questionnaire”

Counsel for the Commission interjects:

“No sir, it is not based on the questionnaire ... that’s where the confusion enters in.... It’s Commerce’s obligation under the statute to initiate the investigation. On the face of the petition there must be at least 25 % of industry support, the industry must have supported that, or Commérce will reject the petition.”
*611 Oral argument at 23:40-24:40 available at http://oralarguments.cafc.uscourts.gov/ default.aspx?fl=2013-1304.mp3.
Court:
“So someone who checked oppose or don’t support isn’t counted in arriving at the 25 %?”

Counsel for the Commission responded:

“That is not part ... they do their exercise separately from what the Commission does. The Commission sends out its questionnaires after initiation.”
Oral Argument at 24:44-25:00.
The above demonstrates that petition support expressions, in ITC questionnaire responses, do not further the enforcement of antidumping laws.
The majority solely relies on Commerce’s Notice of Initiation issued in the underlying investigation for its assertion that statements of “explicit” support in an ITC questionnaire response impact Commerce’s industry support determination. Maj. Op. at 602-03. There is, however, no showing precisely how Giorgio’s ITC questionnaire impacted Commerce’s initial industry support determination. The majority apparently believes that the Notice of Initiation evidences that Commerce considered Giorgio’s preliminary questionnaire response, and specifically points to certain comments made to Commerce under 19 U.S.C. § 1673a(e)(4)(E), which permits interested parties to “submit comments or information on the issue of industry support.”
The Notice states that Commerce received two “comments regarding industry support” on January 22, 1998. 63 Fed. Reg. 5361-62. The first was filed by a Chilean exporter asserting that the petitioners are not members of the applicable U.S. industry. Id. The second, an “expression of opposition,” was filed by Giorgio with respect to the investigation (petition) involving imports from India. 63 Fed.Reg. 5362. The majority speculates that this “expression of opposition” has to be Giorgio’s preliminary ITC questionnaire response. See Maj. Op. at 602-03.
Giorgio’s comment was made pursuant to 19 U.S.C. § 1673a(c)(4)(E), which permits voluntary comments from interested parties concerning any aspect of an initiation, including industry support. It is unreasonable to conclude that Giorgio submitted its ITC questionnaire response for purposes of this comment period. Nor is there any evidence that Commerce consulted Giorgio’s ITC questionnaire response for purposes of this comment period. Conversely, the Notice makes no mention of opposition by Giorgio in connection with the Chile, China, and Indonesia petitions. 63 Fed.Reg. 5362. Borrowing the majority’s view, since the Notice states no opposition from Giorgio with respect to those investigations, one is forced to conclude that Giorgio supported those investigations. But this, too, would be speculation primarily because Commerce, by law, bases its industry support decision on the information provided in the petition. If the petition does not demonstrate the required industry support, the investigation is not initiated.
The majority concludes that Giorgio’s “expression of opposition” and its preliminary ITC questionnaire response are the same document because they were filed on the same day. See Maj. Op. at 602-03. There are a number of plausible reasons that could explain the coincidence, such as parallel due dates for receipt of factual submissions. Indeed, the Chilean comment was also filed on the same day. 63 Fed.Reg. 5361. This does not mean that the Chilean exporter filed its comments via an ITC questionnaire response. It did not.
*612 The majority’s second “consequence” is an impact on the ITC’s material injury determination. Maj. Op. at 602-03. Specifically, the majority asserts that Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 984 (Fed.Cir. 1994) requires that the ITC, “in every case,” take into account a producer’s publicly stated position in its ITC questionnaire response for the purpose of making injury determinations. Maj. Op. at •602-OS. This assertion is not correct, and it ignores the facts of the case. First, this Court noted the difference between a threat of injury case (where views of the industry must be considered) and a material injury case.[11] Thus, we held that “the breadth of relevant factors in Trent Tube, a material injury case, does not govern in this threat of material injury case.” Suramerica, 44 F.3d at 984 (citing Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB, 975 F.2d 807 (Fed.Cir.1992)). Here, the ITC case is not a threat of injury case so the relevant factors relied on in Suramerica have no application. One needs look no further than this case as an example where the answer to the ITC industry support question has no impact on the merits determination. Unlike Suramerica, there is no indication that the ITC relied on Giorgio’s answers to the support question while there is significant evidence that the ITC relied on the trade data provided in the responses to support a finding of material injury in this case. In this regard, Suramerica supports Giorgio’s assertion of a plausible claim.
Having acknowledged that Suramerica did not compel the ITC to consider publicly declared support, the majority instead asserts that the ITC might consider it. Maj. Op. 602-03, n. 7. This assertion does not salvage the petition support requirement’s constitutionality. Under the commercial speech doctrine, a regulation “may not be sustained if it provides only ineffective or remote support for the government’s purpose.” Cent. Hudson Gas & Elec. Corp., 447 U.S. at 564, 100 S.Ct. 2343. The Supreme Court has further explained that “[tjhis burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.” Edenfield v. Fane, 507 U.S. 761, 770-71, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).
It is irrelevant whether the ITC might consider publicly declared support because Giorgio has raised an as-applied, not facial, challenge. Appellant’s Br. at 52. The question is not whether the ITC may, hypothetically, consider a producer’s publicly declared support; it is whether the ITC considered Giorgio’s support answers in this case. Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 289, 42 S.Ct. 106, 66 L.Ed. 239 (1921) (“A statute may be invalid as applied to one state of facts and yet valid as applied to another.”). The majority offers no evidence that the ITC considered Giorgio’s support answer, or that the support answer otherwise alleviated any harm to a material degree.
In sum, the majority bases its reasoning on the assertion that the ITC questionnaire industry support question has “two types” of consequences that directly advance a substantial government interest. Neither of these consequences is based in *613 agency practice, agency regulations, or the trade statutes. Because neither Commerce nor the ITC rely on a producer’s answer to the petition support question to respectively establish industry support under 19 U.S.C. § 1673a(e)(4)(A), or otherwise to affect the outcome of a material injury case, the petition support requirement does not “directly advance” a substantial government interest.[12] As such, the majority opinion renders the CDSOA petition support requirement unconstitutional under the First Amendment. Cent. Hudson Gas & Elec. Corp., 447 U.S. at 564,100 S.Ct. 2343.
The majority also supports its holding by comparing the CDSOA to the False Claims Act, arguing that payments and attorney’s fees under the latter would not be available to a party like Giorgio who “sat on the sidelines and refused to take an open and active role in support of the government.” Maj. Op. at 603 (citation omitted). Such reliance is misplaced because the qui tam provision of the False Claims Act rewards parties that file an action. 31 U.S.C. § 3730(d). The CDSOA does not require that only petitioners may receive a distribution. Conversely, the eligibility of a qui tam plaintiff to qualify for proceeds does not hinge on a statement of “explicit support” for the action.
In any event, the facts in this case show that Giorgio did not sit on the sidelines but rather took significant action and played an important role towards the issuance of the antidumping order. Giorgio’s second amended complaint, which we accept as true at this stage, states that Giorgio supported the preparation of the petition. It contributed over one million dollars ($1,000,000) for legal fees towards preparation of the petition and participation in proceedings before Commerce and the ITC — an amount greater than contributed by any of the petitioners.[13] J.A. 74, ¶ 34. Prior to filing the petition, Giorgio provided the petitioner with confidential information regarding its capacity, production, sales, pricing, and profitability. J.A. ¶ 37. The petition incorporated much of the information that Giorgio provided, e.g., Giorgio’s closing of a production line for its largest can size due to the imports. J.A. 76, ¶ 41. After the petition was filed, Giorgio hosted two ITC staffers for a day-long field visit of the closed production line and reiterated its belief that the low-priced imports caused its closure. J.A. 77, ¶43. This type of “plant visit” is distinct from a verification visit under 19 C.F.R. § 353.36(c). A plant visit is conducted to educate Commerce and ITC personnel on production processes and overall relevant industry practices.
In sum, Giorgio establishes a plausible claim that it is an ADP. For these reasons, I dissent.

. See Pub.L. No. 106-387, §§ 1001-1003, 114 Slat. 1549, 1549A-72 to -75 (codified at 19 U.S.C. § 1675c (2000)), repealed by Deficit Reduction Act of 2005, Pub.L. No. 109-171, § 7601, 120 Stat. 4, 154 (Feb. 8, 2006) (effective Oct. 1, 2007).

. The CDSOA addresses antidumping and countervailing investigations. 19 U.S.C. §§ 1671, 1673. For the most part, this opinion refers to both by its reference to "anti-dumping.”

. An interested party is, for the purposes of this appeal, a U.S. producer of the like product subject to the antidumping investigation. 19 U.S.C. § 1677c. There is no dispute that Giorgio is an "interested party.”

. "Indicate” means to “point out,” "show indirectly,” or "state briefly.” The Merriam-Webster Dictionary 386 (2004).

. Giorgio’s answer to the petition support question in the final questionnaire was identical. J.A. 189. Giorgio did not check any of the boxes.

. In a trade case, there are a number of factors that U.S. producers consider as to whether they should publically or privately express support for a dumping petition. Thus, while a producer can lend economic and evidentiary support for the petition, it may choose, for commercial purposes having nothing to do with its support, not to publically support the petition out of fear of losing U.S., foreign, or downstream customers. See e.g., Oral Argument at 5:20-6:10. Stated differently, the answer to the ITC support question may be based entirely on business • or litigation strategy and have nothing to do with whether a company supports the petition.

. Indeed, Congress's findings included in the statute strongly suggest that Congress intended that U.S. producers like Giorgio would receive distributions. Congress feared that domestic producers would lay off workers and would be reluctant to reinvest or rehire. *607 See Pub.L. No. 106-387, §§ 1002. As described below, that is precisely what Giorgio alleges occurred here: the dumped imports forced it to lay off workers and threatened to put it out of business.

. Giorgio's support of the petition is further confirmed by other supporting actions, including contributing legal fees incurred by the petitioners in the antidumping proceedings (J.A. 74, ¶ 34); providing confidential business information that was included in the petition (J.A. 76, ¶ 42); participating in preinitiation meetings with the petitioners (J.A. 76, ¶ 41); and hosting ITC staffers for a plant field visit and tour (J.A. 77, ¶ 43).

. Being bound by precedent, I accept this holding, but for the reasons that Judge Linn provided in his thoughtful dissent, I believe *610 that the CDSOA should be subjected to strict scrutiny, not evaluated under the commercial speech doctrine. SKF, 556 F.3d at 1370 (Linn, J., dissenting).

. The majority fails to explain what ''consequences” resulted from Giorgio’s answer to the petition support question. Importantly, it is not explained what difference, if any, Giorgio's response had on the investigation.

. For "material” injury cases, the ITC "may” consider factors beyond those listed in the statute. 19 U.S.C. § 1677(7)(B). In "threat” cases, the ITC "shall” consider all relevant economic factors, including publicly declared industry support. 19 U.S.C. § 1677(7)(F)(i). See also Suramerica, 44 F.3d at 984 (describing statutory differences for material and threat cases).

. Further, I have serious concerns regarding, but do not address, the constitutionality of the retroactive application of a statement of "explicit support” requirement to actions taken by U.S. producers two years prior to the enactment of the CDSOA.

. Counsel for one of the petitioners appeared and argued that Giorgio’s lack of support for the India petition undermined the petitions involving imports from other countries. Counsel’s appearance and argument can best be understood in the context of CDSOA distributions. To the extent that Giorgio does not qualify for a distribution (at least $9 million), petitioners share of CDSOA money is significantly increased. This is an absurd result. Congress could not have contemplated a result where a U.S. producer submits a questionnaire response that details evidence of material injury and establishes in clear terms that it is a domestic producer of the like product that is adversely affected by virtue of dumped imports should not be entitled to a share of CDSOA money.